Baldwin, J.
The error in the argument of the appellee’s counsel consists in treating the enlistment in question merely as a contract, and as subject exclusively to the principles affecting the validity of contracts. A *630 contract it undoubtedly is in a certain sense, inasmuch . . , . as it is an engagement between the parties, tor a service to be rendered by one of them, in consideration of a compensation to be yielded therefor by the other. Bat wants one the usual requisites of contracts, a reciprocal obligation in regard to the subject matter. On the one hand, the recruit is bound to serve during the full term of his enlistment; but on the other, the government is not bound to continue him in service for a single day, but may dismiss him at the very first moment, or at any subsequent period, whether with or without cause for so doing. It has moreover a feature not to be found in most contracts; namely, a power in one of the parties to compel specific performance from the other by the exercise of physical force. If the soldier desert, he may be recaptured and coerced to the discharge of his duty by corporal restraint and punishment. These important traits of the engagement result not so much from the specific terms of the compact, as from the relation in which it places the parties towards each other; a relation of authority and control on the one side, and of obedience and submission on the other. It resembles in some respects the relation of master and servant, of the strictest kind between individuals; to wit, the condition of apprenticeship, or other indented servitude. And having regard to the circumstance that the government is one of the parties, it bears perhaps a still closer resemblance to the relation arising out of an appointment to a post or place.under the civil administration; though, from the 'nature of the service, involving a sterner and more despotic supremacy. In fact, the enlistment is an appointment by the government of an individual to the lowest grade of military service; differing only from the commission to an officer, by the inferior rank, emolument and duties, and the incapacity to retire by voluntary resignation. It is commonly founded in com *631 pact, but not necessarily so; for the government, as the administrative sovereign of the country, has an unquestionable right, in certain emergencies, to call the inhabitants capable of bearing arms into its military service, and, by some equitable rule, to select from the whole number those best adapted to the purpose; and this without regard to their consent.
Now it cannot be doubted that the government, like an individual, in regard to appointments to its service, may prescribe the requisite qualifications, and insist upon or waive them in its discretion ; and that the person appointed or selected has no right to relieve himself from his engagement, by objecting his own want of qualification. And so it is equally clear, as the act may be done through the instrumentality of an agent, that if he should transcend or neglect the instructions of his principal in regard to qualification, the latter is not obliged to repudiate the transaction, but may sanction and confirm it without the concurrence of the other party to the engagement.
Let us now enquire how far these principles are applicable to the case before us. And this must depend upon the legislation of congress on the subject. The question may be considered as arising on the construction of the act of congress of the 16th of March 1802, fixing the military peace establishment of the United States ; for though there has been subsequent legislation on the subject, it has no material bearing upon the present case. The provisions of the 11th and 12th sections of that act are as follows :
“§ 11. That the commissioned officers who shall be employed in the recruiting service, to keep up by voluntary enlistment the corps as aforesaid, shall be entitled to receive for every effective, ablebodied citizen of the United States who shall be duly enlisted by him for the term of five years, and mustered, of at least five feet six inches high, and between' the ages of eighteen *632 and thirty-five years, the sum of two dollars: provided nevertheless that this regulation, so far as respects the height and age of the recruit, shall not extend to musicjanS) or to those soldiers who may reenlist into the service: and provided also that no person under the age of twenty-one years shall be enlisted by any officer, or held in the service of the United States, without the consent of his parent, guardian or master first had and obtained, if any he have; and if any officer shall enlist any person contrary to the true intent and meaning of this act, for every such offence he shall forfeit and pay the amount of the bounty and clothing which the person so recruited may have received from the public, to be deducted out of the pay and emoluments of such officer.
“ ^ 12. That there shall be allowed and paid to each effective, ablebodied citizen, recruited as aforesaid to serve for the term of five years, a bounty of twelve dollars ; but the payment of six dollars of the said bounty shall be deferred until he shall be mustered and have joined the corps in which he is to serve.” Story’s Laws U. S. p. 832.
These provisions, it will be seen, had a fourfold object : 1. To keep up the peace establishment of the army by voluntary enlistments. 2. To encourage recruiting, by a premium to the recruiting officer, and a bounty to the recruit. 3. To procure for the government recruits best adapted to the service, and protect it against inadequate selections. 4. To protect minors from their own improvident engagements. The protection to the government was afforded by the legislative instructions to the recruiting officer, and punishment for disobedience. The protection to the minor was extended in like manner, and still more effectually, by requiring the consent of his parent, guardian or master. No protection was furnished or contemplated for the adult recruit. None whatever was requisite or pro *633 per. His want of qualification is best known to himself, and his entering the service is a fraud upon both the government and its agent, if the defect be unknown to the latter; and if known, then it is an act of collusion with him to deceive and injure the principal. His conduct, instead of entitling him to protection, ought to subject him to punishment; and accordingly in the british recruiting service, by statute 10 Geo. 4. ch. 6. § 34. 7 Bac. Abr. by Dodd (London edi. of 1832) p. 379. title Soldiers, letter A. he is justly exposed to very severe penalties.
It will be seen that the qualifications prescribed by this act of congress, for the regulation of the recruiting officer, are, 1. That the recruit shall be effective and ablebodied ; 2. That he shall be a citizen of the United States; 3. That he shall be at least five feet six inches high ; 4. That he shall be between the ages of eighteen and thirty-five years. These requisites were obviously designed for the benefit of the government, and in order to obtain recruits best fitted for the service. They are all placed on the same footing, without discrimination ; all based upon the idea of qualification alone, all embraced in the same mandate, and all enforced by the same penalty. It is impossible to distinguish between the want of citizenship and the want of any other qualification ; and if a recruit be entitled to his discharge because he is an alien, he would be equally entitled to it because only five feet five inches and eleven twelfths in height,* or thirty-five years and one day old. There is no better rule of interpretation than this, that “ no statute shall be construed in such manner as to be inconvenient or against reason.” If a recruit were to claim exoneration from the service, on the ground that at the time of his enlistment he was under size, or under age, or infirm in body, would it not be a sufficient *634 answer that the government, in its discretion, waived the objection, because he had since attained the requisite height or age, or had recovered, or would probably recover,, from his disease ; or because he possessed fi which would more than compensate for his alleged deficiencies ? And so if the plea be that of alienage, is it not enough to say that, though constrained to the admission that the native or naturalized citizen must be supposed to possess greater valour, higher intelligence and more approved fidelity than a mere stranger, yet there may be exceptions to the general rule; and that in the particular case-the petitioner is a gallant and disciplined soldier, whose oath of fidelity when he took the bounty, and his long residence and connexions and interest in the country, furnish sufficient security for the faithful discharge of his duties ?
The law, in no part of. it, is founded upon a supposed disability of the recruit to bind himself by his compact of enlistment. No such disability is recognized by the act even in regard to minors, but a mere protection granted to the immaturity of intellect, by requiring the consent of the parent, guardian or master. Without that qualified exemption, boys of any age would be subject to enlistment in the army, as they are in the navy, not only without but against the consent of their natural or legal protectors; for the national sovereignty, in the exercise of its constitutional powers, may overrule the municipal laws of the states in relation to the incapacity of infants. United States v. Bainbridge, 1 Mason’s Rep. 71. An alien has no right, founded upon any principle either of municipal or international law, to claim exemption from the consequences of his own voluntary engagement, whether for military or any other service. No one supposes that he labours under a disability in this respect; for though, by such a stipulation, he may by possibility involve himself in difficulties in regard to his allegiance to bis native sove *635 reign, that is a matter for his own consideration, and cannot affect the validity of his new obligation. If any authority were necessary for so self-evident a proposition, it would be found not only in the practice of employing foreign mercenaries, which has prevailed amongst civilized nations in all ages, but in the doctrine as laid down by the most approved writers. Vattel, book 1. ch. 19. § 213. 1 Black. Comm. 370.
The rules by which the courts refuse to enforce contracts that are contrary to law have no application to a case like this ; for the contract of enlistment, if to be so called, is not obligatory upon the government, under any circumstances, and cannot, as has been shewn, be the less obligatory upon the recruit because he does not possess the requisite qualifications. The act of congress does not in that event declare the enlistment to be void, or exclude the recruit from the service, but merely subjects the recruiting officer to punishment for his disregard of the legislative instructions. That the legal prohibition amounts to nothing more than this, is obvious from the consideration that the penalty is founded exclusively upon the actual misconduct of the officer; for though its letter is broad, its spirit surely would not reach beyond the case of wilful disobedience or culpable negligence ; and such is the practical interpretation given to it by the war department. Army Regulations of 1841, p. 126. 127. Now it would be a new principle to establish, that the misconduct of a public officer in the performance of an official act shall avoid the transaction, against the consent of the party aggrieved, and for the sole benefit of another party in no wise prejudiced : and it would be still more strange, if the act prohibited to the officer has been procured without his connivance or default, by the fraud of the party complaining.
In what has been said, 1 have regarded the law of congress as designed to regulate the recruiting service *636 with a view to the qualifications of recruits, and not by such weighty considerations as a fear for the public safety, or a jealousy of executive power. If in the legislative mind the republic would be endangered by the foreign nativity or the debility of enlisted soldiers, a policy so grave would have been marked by decisive enactments, and not exhausted in petty penalties upon a subaltern officer. It is moreover remarkable, in reference to unnaturalized inhabitants, that, by a fluctuating legislation, the policy of employing them has varied, not according to the hazard but the utility of their military services ; for the authority to enlist them has • been given to the recruiting officer in limes of greatest peril, and withheld in those of greatest security. Thus by the acts of 1802, 180S, and 1816, he is directed to enlist ablebodied citizens; but by the acts of 1811, 1812, 1813, and 1814, the direction is to enlist ablebopied men. 2 Story’s Laws U. S. p. 832. 1089. 1510, 1205. 1285. 1433. And in another branch of the public defence of not less importance, and deeper solicitud e to the nation, aliens are habitually and lawfully employed on that perilous field of her glory where the treacherous mercenary may find fit allies in the treacherous winds and waves. The act of congress of the 3d of March 1813, “ for the regulation of seamen on board the public and private vessels of the United States,” 2 Story’s Laws U. S. p. 1302. throws light upon the present subject in two points of view; for in the first place it expressly declares, that after the termination of the then existing war with Great Britain, the employment of aliens on board all such vessels shall be unlawful, and adopts the most decisive and vigorous measures, both precautionary and vindicatory, to prevent it; and then provides that the provisions of the act shall have no operation with respect to the subjects of any foreign nation which shall not, by treaty or special convention with the government of the United States, *637 have prohibited the employment of native citizens of the United, States on board of her public or private vessels. This act thus indicates, on the one hand, that where a policy of utter and unqualified exclusion from the service exists, it is not left by congress to a vague, indirect and doubtful implication; and on the other, that such a policy is never dictated by a puerile jealousy or a petty apprehension of danger.
A case like the present may, I think, be safely left to executive discretion in the discharge of the constitutional duty to take care that the laws be faithfully executed ; inasmuch as the exercise of that discretion in the one way or the other can be no encroachment upon the legislative power; for as the war department may dismiss a recruit without cause shewn, so it is no good cause for his dismission that he has practised an imposition upon the government in regard to his qualification. This construction of the statute is, I think, in the true spirit of the law; while the opposite would open the door widely to the vilest frauds upon the public service. It is proper however to say, in justice to the petitioner, that the record of this case furnishes no evidence of his having practised a fraud upon the recruiting officer.
I have considered the case as standing upon the footing of an original enlistment; inasmuch as it does not appear from the record, that the petitioner’s reenlistment was into the company or regiment to which he belonged at or about that time. If such were the fact, there could not be even a plausible objection on his part to the validity of his engagement; because the acts of congress of the 2d of March 1833 and the 5th of July 1838 give a bounty to “every ablebodied noncommissioned officer, musician or private soldier, who may reenlist into bis company or regiment within two months before or one month after the expiration of his term of service;” thus dispensing with all other qualifications. *638 Sess. Acts of 1832-3, p. 72. § 3. and of 1837-8, p. 105. § 29. Whether the irrregularity of reenlisting into a different company or regiment would affect the question of qualification, I deem it unnecessary to consider: ^presíúon is that it would not. However that may be, these acts serve to confirm the conviction, that in the .legislation of congress on this subject, citizenship has never been regarded in any other light than as a mere qualification.
Note by the reporter.—The supreme court of New York made á similar decision at May term 3843. The decision, so far, has only been made known through the newspapers. It will no doubt be found hereafter in the regular reports of the decisions at that term.
I -am of opinion that the judgment of the circuit court ought to be„reversed, and the appellee remanded to the service.
The other judges concurring, the judgment of the circuit court was accordingly reversed, and judgment entered declaring that the defendant was lawfully detained in custody, and remanding him into the service of the United States according to the terms of his enlistment.

 Note by the judge. The qualification as to height has been since abolished. Sess. Acts of Congress of 1837-8, p. 105.