REID v. UNITED STATES.

(District Court, S. D. New York. May 14, 1908.)

**1. ARMY AND NAVY—DISCHARGE OF SOLDIER—AUTHORITY OF PRESIDENT.**

The contract of a soldier of the United States, made by his enlistment and oath to serve for a definite term, "unless sooner discharged by proper authority," is one terminable by the government at will, acting through an officer having proper authority, and the fourth article of war (Rev. St. § 1342, [U. S. Comp. St. 1901, p. 945]) which provides that "no discharge shall be given to any enlisted man before his term of service has expired except by orders of the President, the Secretary of War, the commanding officer of a department or by sentence of a general court martial," confers such authority upon, or recognizes it as existing in, the President of the United States.

**2. SAME—TERMS OF DISCHARGE.**

The terms of a discharge given to a soldier by order of the President, not being prescribed by any statute, are discretionary with the President, and such discretion, exercised by directing a discharge "without honor," cannot be reviewed by the courts.

Action under Tucker Act March 3, 1887, c. 359, 24 Stat. 505 (U. S. Comp. St. 1901, p. 752). On demurrer to answer.

On July 18, 1904, the petitioner enlisted as a soldier in the army of the United States, and took oath to serve as such soldier "for the period of three years unless sooner discharged by proper authority." This enlistment oath, together with Reid's application to enlist and the record of his physical examination, constitute his enlistment papers, and embody whatever contract was made between him and the United States in respect of his engagement as a soldier. He was assigned to the Twenty-Fifth Infantry, and on August 13, 1906, was stationed, with a battalion of his regiment, at Fort Brown, which is in or contiguous to Brownsville, Tex.

During the night of August 13–14th, certain persons repeatedly discharged firearms in the streets of Brownsville. The firing was apparently at random, but resulted in the killing of one man and the wounding of several others. It was the general, if not the universal, belief of the citizens of Brownsville that this murderous riot was perpetrated by certain soldiers of the Twenty-Fifth. The disturbance was first investigated by an Inspector General under orders from the Military Secretary, and later, upon the President's own order, by the Inspector General of the army. This officer reported that in his opinion it had been established by careful investigation that the random firing aforesaid had been done by unidentified enlisted men of the Twenty-Fifth Infantry belonging to the garrison of Fort Brown. He further reported that the enlisted men of that command had failed to tell all it was reasonable to believe they knew concerning the riot, and concluded that "they (said enlisted men) appeared to stand together in a determination to resist the detection of the guilty." Upon the submission and approval of this report, an order was issued by the President's direction on November 9, 1906, requiring the discharge without honor of practically all the enlisted men comprising the garrison of Fort Brown. The men so discharged were by said order debarred from re-enlisting in the army or navy, but they were granted travel pay, and by a subsequent order of December 12, 1906, re-enlistment applications were permitted if made in writing accompanied by evidence that the applicant had not been implicated in the riot aforesaid, nor withheld any evidence that might lead to the discovery of the perpetrators thereof. Such applications, however, were to be submitted to the War Department for consideration and investigation before action could be taken by recruiting officers.

Reid, having received his discharge under these circumstances, brings this petition to recover the pay and emoluments which would have accrued to him from the date of such discharge to the expiration of his three-year term of enlistment, and, inasmuch as he brings suit under the Tucker act, it is neces-

sarily implied that claim is asserted upon a "contract express or implied with the government of the United States, or for damages * * * in a case not sounding in tort in respect of which * * * he would be entitled to redress against the United States either in a court of law, equity or admiralty if the United States were suable."

A separate defense contained in the answer sets forth at length the documents supporting the statement hereinabove made, and avers that the "order of the President and the said discharge (of Reid) were not made as punishment of the petitioner or of others but for the good of the service and for the maintenance of the morale of the army." To this defense there is a general demurrer.

Mellen & Woodbridge, for petitioner.
Henry L. Stimson, U. S. Atty.

HOUGH, District Judge (after stating the facts as above). Several matters discussed at bar must be laid aside as immaterial to the disposition of this cause. Whether Reid or his comrades, or any of them, were guilty of the riotous disturbance in question; or whether Reid personally committed any infraction of good order or military discipline; or whether he is in fact a desirable soldier; or whether he knew or withheld anything tending toward the discovery of the perpetrators of the Brownsville riot; or whether, so far as Reid or others are concerned, the President's action was unnecessarily severe, cruel, or unjust—are questions beyond this judicial investigation.

The material inquiries seem to me very few. The nature of a soldier's contract of enlistment has been sufficiently treated in Re Grimley, 137 U. S. 147, 11 Sup. Ct. 54, 34 L. Ed. 636. By his contract Reid assumed the burden of military service, not for a definite time, but for three years, "unless sooner discharged by proper authority." Nothing is expressed in the enlistment papers as to what reasons shall be sufficient for early discharge, and, if the engagement be treated merely as a civil contract of hire, the government would be entitled to dispense with Reid's services under it at any time, provided the authority, i. e., the officer directing discharge or dismissal, be "proper." In other words, if enlistment be no more than a hiring by civil contract, under this particular contract, the corporate master may discharge the servant whenever he pleases, and for or without cause, provided only the officer directing discharge be "proper authority."

I do not give assent to the assertion that a soldier's engagement is or bears much resemblance to a civil contract of hire; but, on the assumption (most favorable to petitioner) that it is such a contract, it is, on the part of the government, a general contract terminable at will, if that will be expressed through a proper officer. Martin v. New York Life Ins. Co., 148 N. Y. 118, 42 N. E. 416. This petitioner was, so far as formalities attending his severance from the service are concerned, properly discharged; that is, his discharge paper was correct in form and signature, and so much is not denied. But the "authority" causing and directing his discharge was the President of the United States, who personally gave the order therefor, so that the final question, upon assumptions very favorable to petitioner, is whether the President, as Commander in Chief of the Army, is "proper authority" to terminate in invitum a soldier's enlistment. This question must be answered affirmatively, if either (1) there be in-

herent constitutional authority in the President, as Commander in Chief, so to do; or (2) there be such authority in the absence of congressional statutory action limiting, defining, or regulating the commander's power; or if (3) in this case the President acted in accordance with the various acts of Congress regulating the army and discharges therefrom.

As to the first and second of these last queries, no opinion is expressed, because the last question must in my judgment be answered unfavorably to the petitioner.

The articles of war constitute the only statutory declaration concerning discharges from the military service (Rev. St. § 1342 [U. S. Comp. St. 1901, p. 945]). Article 4 provides:

" * * * No discharge shall be given to any enlisted man before his term of service has expired except by order of the President, the Secretary of War, the commanding officer of a department or by sentence of a general court martial."

And this language has remained unchanged in the statutes since 1806.

I am quite unable to perceive how the President's right to terminate a soldier's engagement could be more explicitly recognized, and indeed conferred, if recognition seems to imply some antecedent right. This fourth article of war clearly assumes that discharges may be granted before expiration of service; the power to grant them implies the power to impose them, unless a soldier have some rights inherent in his contract or inferable from the nature of his occupation. This petitioner's contract is civilly but a hiring at the will of the employer, while the nature of his occupation, so far from varying that status, has been frequently so judicially defined as to leave no doubt of congressional intent. "The recruit is bound to serve during the full term of his enlistment, but * * * the government is not bound to continue him in service for a single day, but may dismiss him at the very first moment or at any subsequent period whether with or without cause for so doing." United States v. Cottingham, 1 Rob. (Va.) at page 629, 40 Am. Dec. 710.

The civil compact usually requires for its dissolution the mutual consent of the parties, but "the military compact may be dissolved at any moment by the supreme authority of the government." U. S. v. Blakeney, 3 Grat. (Va.) 405, cited in Re Morrissey, 137 U. S., at page 159, 11 Sup. Ct. 57, 34 L. Ed. 644. And this historical view of the soldier's relation to the government or the crown antedates the founding of this nation and is the accepted doctrine of the British military establishment upon which ours was modeled. In re Tuffnell, L. R. 3 Ch. Div. 173.

Even if, therefore, there be no inherent power of control over the military forces of the nation vested in its constitutional Commander in Chief, and even if, also, there be no grant of power contained in that title in the absence of congressional gift thereof (concerning which no opinion is expressed only because I do not find the discussion necessary for this case), the statutory grant contained in the fourth article of war must be interpreted in the light of military practices, customs, and procedure well known and judicially recognized long

before the date of the Revised Statutes, and, indeed, long before the adoption of our earliest articles of war, in 1806, and by those customs so recognized and approved by Congress, the soldier's engagement was but at the will of the government which he served, and that government by authority of Congress speaks through (for the purposes of this case) the President of the United States.

It is, however, further asserted that some infraction of law was wrought by forcing upon Reid a "discharge without honor." The phrase is not known to the statutes. It is found only in the army regulations, which are from time to time promulgated by the Secretary of War, but do not bind the Secretary that makes them, and much less the Commander in Chief. Smith v. U. S., 24 Ct. Cl. 209. The exact method of this soldier's discharge and the quantum or kind of character that should be given him, not being regulated by statute, must necessarily be left in the discretion of the executive officer having power to grant some kind of discharge. That it is beyond the power of the judicial branch to coerce or review the discretion of the executive is familiar doctrine, while that a discharge with a very bad character is not a punishment to the man discharged within the meaning of any federal statute is settled by U. S. v. Kingsley, 138 U. S. 87, 11 Sup. Ct. 286, 34 L. Ed. 896.

The demurrer is overruled, and, as that portion of the answer demurred to presents in my judgment a complete defense to the petition, final judgment is directed in favor of the government and against the petitioner.