**John H. HARMON, III, Appellant,**

v.

**Wilber M. BRUCKER, Individually and as Secretary of the Department of the Army, Appellee.**

No. 13230.

United States Court of Appeals District of Columbia Circuit.

Argued Sept. 19, 1956.

Decided Jan. 31, 1957.

Writ of Certiorari Granted May 13, 1937. See 77 S.Ct. 863.

---

614

Mr. David I. Shapiro, New York City, of the bar of the Court of Appeals of New York, *pro hac vice*, by special leave of Court, with whom Mr. James H. Heller, Washington, D. C., was on the brief, for appellant.

Mr. Donald B. MacGuineas, Atty., Dept. of Justice, with whom Asst. Atty. Gen. George Cochran Doub, Mr. Oliver Gasch, U. S. Atty., and Messrs. Samuel D. Slade and Howard E. Shapiro, Attys., Dept. of Justice, were on the brief, for appellee.

Before PRETTYMAN, BAZELON and DANAHER, Circuit Judges.

PRETTYMAN, Circuit Judge.

John Henry Harmon, III, was inducted into the Army on October 31, 1952, under the Universal Military Training and Service Act.[1] In May, 1953, some questions concerning membership in and relations with the Communist Party, and similar matters, were addressed to him by Army officials. He replied under oath, answering some questions and refusing to answer others on the ground of possible self-incrimination; his answers were reduced to writing and signed by him. In February, 1954, he was notified by the Adjutant General of the Army that he should reply to certain derogatory information which had been received concerning him. This derogatory information was itemized in seven specifications, "a" to "g". Items "a" through "d" and Item "g" concerned reported activities on Harmon's part, Item "e" activity on his father's part, and Item "f" activities on his stepmother's part. Harmon replied to the items concerning himself, but as to Items "e" and "f" he said: "It is with deepest moral indignity coupled with a devout sense of filial piety, that I refuse to answer the derogatory statements made under allegations e and f. As neither my father nor stepmother are employed in any capacity by the federal government, I am led to the conclusion that derogatory information concerning them is wholly irrelevant to the case at hand." Thereafter Harmon was informed that his discharge as disloyal or subversive under Army Regulation 615–370 had not been favorably considered and that he would be retained in the service in his then-present grade. Shortly thereafter the Secretary of Defense issued Directive 5210.9, the purpose of which was to apply to military personnel the security programs established by Executive Order 10450, 5 U.S.C.A. § 631 note, in respect to civilian Government employees. It directed that the standard for retention within the armed services should be "that on all the available information it is determined that the * * * retention is clearly consistent with the interests of national security." The directive was accompanied by a memorandum from the Secretary, directing that a review be made of all cases which had theretofore been cleared. Thereupon Harmon's case was reviewed, and the Army Personnel Board found that his further retention in the service was inconsistent with the interests of national security and recommended that he be discharged with an undesirable discharge. On June 2, 1954, he was discharged as undesirable. Harmon appealed the the Army Discharge Review Board to have the character of

---

1. 62 Stat. 604 (1948), 65 Stat. 75 (1951), as amended, 50 U.S.C.A.Appendix, § 451 et seq.

his discharge changed from undesirable to honorable. He was given a hearing, at which he appeared, and thereafter his application for a change was denied. He applied to the Army Board for the Correction of Military Records for the change in his discharge, and that application was denied. He then made a direct request to the Secretary for award of an honorable discharge, and this request was reviewed by an Assistant Secretary, who referred it to the Board for the Correction of Military Records. Harmon declined a hearing before that Board, stating that he had no additional facts to present. He took the position that the discharge certificate must accurately and adequately reflect the character of his military service and that, inasmuch as the character of this service, as set forth in his service record, was "excellent", he should receive an honorable discharge. The Board recommended against a change in the discharge, and the Assistant Secretary approved that recommendation.

Harmon filed a complaint in the District Court, praying that the action of the Secretary in discharging him with an undesirable discharge be declared null, void and illegal as in violation of the Constitution, the statutes, and Army regulations; and that his discharge be ordered changed from undesirable to honorable. On February 3, 1956, the District Court granted the Secretary's motion for summary judgment, on the ground that the court lacked authority to review, control or compel the granting of particular types of discharge certificates to persons discharged from the Army.[2] Harmon appealed. Thereafter the Army Discharge Review Board, in the course of a general review of military personnel security cases, reviewed Harmon's case, and the character of his discharge was changed from undesirable to general under honorable conditions. He was thereupon issued a discharge certificate reading:

General Discharge

Under Honorable Conditions from the Armed Forces of the United States of America

This is to certify that John Henry Harmon III US51 207 184 Private AUS was Discharged from the

Army of the United States

on the 2d day of June 1954

under honorable conditions

[Signed] R L Richstatter
R L Richstatter
*Captain Adjutant General's Corps*

The Secretary suggested to this court that the case thus became moot. Harmon opposed the suggestion, upon the ground that the controversy was whether he should receive an honorable discharge. This court, on August 17, 1956, by order denied the Secretary's suggestion of mootness.

The alleged derogatory information concerning Harmon which was incorporated in Items "a", "b" and "c" of the initial notice of the Adjutant General concerned activities in 1951 and 1952 in a camp reported to be Communist-operated, employment in 1949 in an organization reported to be subversive, and registration in 1952 with the American Labor Party, cited by the House Committee as being under Communist control. All these alleged activities were prior to Harmon's induction into the Army. Item "d" was that Harmon "Solicited contributions of money for the defense of persons under indictment for violation of the Smith Act." Within a month after his induction into the Army Harmon wrote a letter to two friends, suggesting that they make a financial contribution to assist in the defense of two individuals who had been indicted under the Smith Act. Item "g" was that Harmon had been "Associated with persons who were Communists or Communist sympathizers." In response to this item Harmon

---

2. Harmon v. Brucker, D.C., 137 F.Supp. 475 (1956).

said he was not then nor had he ever been a member of the Communist Party but that in the course of appearances before many groups and audiences it was quite possible that he had known or been acquainted with Communists or their sympathizers.

In respect to Harmon's military service the Secretary says that his (Harmon's) service record was marked "excellent" for the periods November 12, 1952, to July 24, 1953, and from August 2, 1953, to April 24, 1954, and that for the balance of his service his record was marked "unknown" as to character and efficiency.

As the case is now before us, the questions are (1) whether the court can declare null and void the action of the Secretary in discharging Harmon with a "General Discharge Under Honorable Conditions" and (2) whether the court can order the Secretary to change Harmon's discharge from "General Discharge Under Honorable Conditions" to "Honorable Discharge". We agree with the District Judge that the court cannot take either of such actions.

The nub of Harmon's contention on the first question is that he is entitled to judicial review of the Army's action. He does not contend that he could not be discharged; his complaint goes to the type of discharge given him. He was accorded all the procedural steps established by the Army regulations for the consideration and determination of the propriety of discharges from the military service. As we have pointed out, he specifically told the Army authorities that he had no further facts to present. No statute was misapplied in the process or the substance of the discharge. No statute directs or authorizes judicial review of Army discharges. Indeed the statute provides that decisions of the Army boards shall be final.[3] Thus Harmon's argument must rest upon constitutional grounds: that as a matter of due process of law or by some other constitutional requirement he was entitled to court review of the type of discharge which he should be given.

■■ The Constitution provides that the President shall be Commander in Chief of the Army and Navy of the United States[4] and that Congress shall have power to make rules for the government and regulation of the land and naval forces.[5] Title 10 of the United States Code clearly expresses a Congressional intent that the Army be administered solely by the executive branch of the Government.[6] The statute in effect at the time of Harmon's discharge provided[7] that "No enlisted person, lawfully inducted into the military service of the United States, shall be discharged from said service without a certificate of discharge, and no enlisted person shall be discharged from said service before his term of service has expired, *except in the manner prescribed by the Secretary of the Department of the Army,* or by sentence of a general or special court-martial." (Emphasis ours.) Throughout our history the Articles of War and similar statutes have entrusted to the Secretary of War and his agents the granting of certificates of discharge.[8] The statute which authorized the Secretary to establish a board to review the types and natures of discharges specifically provided that the findings of such a board should be "final subject only to review by the Secretary of the Army".[9] The courts have held many times that they have no power to

3. Act of June 22, 1944, 58 Stat. 286, as amended, 38 U.S.C.A. § 693h.

4. Art. II, § 2, cl. 1.

5. Art. I, § 8, cl. 14.

6. 10 U.S.C. § 3012 (1956) [formerly 5 U.S.C.A. § 181–4, 64 Stat. 264 (1950).

7. 41 Stat. 809 (1920), as amended, 10 U.S. C.A. § 652a (Supp. 1956) [now 10 U.S. C. § 3811 (1956)].

8. Winthrop, Military Law and Precedents 547, 931, 933, 961, 972 (2d ed. 1920) ; Act of April 10, 1806, 2 Stat. 359, 361; Rev.Stat. § 1342, Art. 4 (2d ed. 1878); Sec. 4(b), Selective Service Act of 1948, 62 Stat. 606, as amended, 50 U.S.C.A. Appendix, § 454(b).

9. Supra note 3.

review the administrative processes by which the President and the Secretaries administer the affairs of the Army, and this doctrine has extended to the nature of discharges from the service.[10] On this subject we said (in Gentila v. Pace: [11]

> "We think Congress intended that the Board's [the Army Discharge Review Board's] full and 'final' review should not be subjected to a further review, or series of reviews, in the courts. We may suppose that Congress considered the heavy burden that would be imposed upon courts if they were required to review the findings upon which Army discharges are based. As the Supreme Court has said in regard to a type of dispute for which the Railway Labor Act [45 U.S.C.A. § 151 et seq.] provides, the 'intent seems plain—the dispute was to reach its last terminal point when the administrative finding was made. There was to be no dragging out of the controversy into other tribunals of law.' Switchmen's Union of North America v. National Mediation Board, 320 U.S. 297, 305, 64 S.Ct. 95, 99, 88 L.Ed. 61."

It is said that the foregoing statement was *dictum*. Whether that be so or not, we think the statement is correct. We adhere to it and adopt it for application here.

The import of the opinion of the Supreme Court in Orloff v. Willoughby [12] is the same as that of the opinions we have cited. There a physician inducted into the Army under the Doctors Draft Act [13] refused to state whether he was a member of the Communist Party. Because of this refusal he was not commissioned or given the duties of an Army doctor. He applied to a federal court for *habeas corpus* and for a discharge. He urged that it had been a uniform practice to commission Army doctors and, furthermore, that his induction under the Doctors Draft Act contemplated and required that he be given a commission. The Supreme Court held that the courts have no power to review such a matter. which fell within the executive duties of the President and the Army. The Court observed:

> "We know that from top to bottom of the Army the complaint is often made, and sometimes with justification, that there is discrimination, favoritism or other objectionable handling of men. But judges are not given the task of running the Army. The responsibility for setting up channels through which such grievances can be considered and fairly settled rests upon the Congress and upon the President of the United States and his subordinates. The military constitutes a

10. United States v. Eliason, 16 Pet. 291, 41 U.S. 291, 301–302, 10 L.Ed. 968 (1842) ; Reaves v. Ainsworth, 219 U.S. 296, 304, 306, 31 S.Ct. 230, 55 L.Ed. 225 (1911), affirming 28 App.D.C. 157 (D.C.Cir. 1906) ; Creary v. Weeks, 259 U.S. 336, 42 S.Ct. 509, 66 L.Ed. 973 (1922) ; French v. Weeks, 259 U.S. 326, 42 S.Ct. 505, 66 L. Ed. 965 (1922) ; Reid v. United States, 161 F. 469 (D.C.S.D.N.Y.1908), writ of error dismissed, 211 U.S. 529, 29 S.Ct. 171, 53 L.Ed. 313 (1909) ; Davis v. Woodring, 72 App.D.C. 83, 111 F 2d 523 (D.C.Cir.1940) ; Schustack v. Herren, 234 F.2d 134 (2 Cir. 1956) ; Nelson v. Peckham, 210 F.2d 574 (4 Cir. 1954) ; Bernstein v. Herren, 136 F.Supp. 493 (D.C.S.D.N.Y.1955), Id., 141 F.Supp. 78 (D.C.S.D.N.Y.1956), affirmed 234 F.

2d 434 (2 Cir. 1956) ; Weeks v. United States, 51 App.D.C. 195, 277 F. 594 (D.C. Cir.1922), affirmed sub nom. Creary v. Weeks, 259 U.S. 336, 42 S.Ct. 509, 66 L.Ed. 973, (1922) ; Marshall v. Wyman, 132 F.Supp. 169 (D.C.N.D.Cal.1955) ; Nordmann v. Woodring, 28 F.Supp. 573 (D.C.W.D.Okl.1939) ; McKenzie v. Kirkpatrick, 141 F.Supp. 49 (D.C.N.D.Cal. 1956).

11. 90 U.S.App.D.C. 75, 77, 193 F.2d 924, 927 (1951), certiorari denied, 342 U.S. 943, 72 S.Ct. 556, 96 L.Ed. 702 (1952).

12. 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953).

13. 64 Stat. 826 (1950), 50 U.S.C.A.Appendix, § 454(i).

specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters. While the courts have found occasion to determine whether one has been lawfully inducted and is therefore within the jurisdiction of the Army and subject to its orders, we have found no case where this Court has assumed to revise duty orders as to one lawfully in the service."[14]

Reason and the practicalities dictate the rule which we have found in the cases. Reason, flowing from the doctrine of the separation of powers, dictates that in many fields the administrative discretion of the executive branch and the legislative discretion of the legislative branch be not subject to interference or review by the courts. In no field is this doctrine more pertinent and important than in the operation of the armed forces. Provisions for the establishment and operation of such forces necessary to the security of this country are wholly legislative matters, and the administration of those forces is the very essence of executive action. The Constitution so provides. Only in the most extreme cases can the judiciary interfere in this area. As a practicality the operation of military forces requires expeditious, sometimes instant, action and thus requires discipline. From the standpoint of the Army it is easy to see the disastrous effect upon discipline if the type of discharge which could be given an enlisted man were not within the power of his commanding officer or the Secretary, but were subject to litigation and to review and decision by a court wholly removed from the necessities of military affairs. As a further matter of practicality, from the standpoint of the courts review of such matters would impose an appalling burden, with which the courts are wholly unequipped to cope.

Harmon's insistence is that the type of discharge given him must be determined by the character of his military service and without regard to pre-induction events, activities, etc. But that is not our question. Our question is not what type of discharge he ought to be given; it is whether a court can review and determine the type of discharge. Harmon says a court can and must do so. To reach that conclusion a number of propositions are suggested.

■ The first such proposition concerns procedural due process. Harmon was given an opportunity to reply to the alleged derogatory information and was then issued a discharge. Thereafter he was given a hearing before the Army Discharge Review Board. He appealed that Board's adverse decision to the Army Board for the Correction of Military Records, again without success. Later, in connection with a direct appeal to the Secretary, he was offered a second hearing, which he declined. Harmon was thus given the full measure of procedural rights afforded by the Congress for persons in the military service. The Supreme Court held in Reaves v. Ainsworth:[15] "Besides, what is due process of law must be determined by circumstances. To those in the military or naval service of the United States the military law is due process. The decision, therefore, of a military tribunal acting within the scope of its lawful powers cannot be reviewed or set aside by the courts."

■ Harmon urges that the Army violated Directive 5210.9 by failing to give him a hearing. He was notified on May 26, 1954, of his proposed discharge. The Directive provides "an opportunity 'upon request to present any cause why he should not be so separated." Harmon made no such request. Later, as we have

---

14. 345 U.S. at pages 93–94, 73 S.Ct. at page 540.
15. 219 U.S. 296, 304, 31 S.Ct. 230, 55 L.Ed. 225 (1911). And see Burns v. Wilson, 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953).

pointed out, he was afforded a hearing before the Review Board. The requirements of procedural due process were fully met.

■ We find no question of substantive due process. The consideration of pre-induction activity was not frivolous, arbitrary or discriminatory; it was based upon reasonable grounds. Activity in the Communist movement involves participation in a conspiracy dangerous to our national security. Surely the Army cannot be compelled to retain a security risk in its service. Surely the President may apply to military personnel the same program and policies as to security and loyalty which he applies to civilian personnel in sensitive positions in the Government civilian service.[16] Harmon does not contend that he could not be separated from the service because of pre-induction conduct. If that be so, if he can be discharged as a security risk, the Army can determine whether he is or is not a security risk. And in that determination surely no data is more relevant and material than are his past habits, activities and associations. Such data is universally the material from which a determination of character or suitability is made, if indeed it is not the only material from which it can be made. The Army, in making that determination, was not trying to find him guilty or not guilty of some act or offense. It was trying to determine his character as a security risk *vel non* and his consequent suitability for Army service. If it could make that determination, as admittedly it could, and upon that basis could determine whether a man was suitable for any service whatsoever, it could include that consideration among the factors to be considered in determining the value of his service and, consequently, in selecting the type of discharge to be given him. Moreover it is

reasonable for Army authorities to believe that a security risk is not usable for many types of military service required of other soldiers, and that factor may well affect the value of the military service of such a person and, consequently, the type of discharge given him.

An honorable discharge from the Army is, as Harmon claims it is, a mark of distinction. The courts cannot dictate to the Army that it must give this mark to an enlisted man when it finds, on the basis of pre-induction activities, that his presence in the armed forces is not consistent with the national security.

■ It is suggested that a general discharge under honorable conditions imposes a "stigma" and so is punishment. Punishment, it is said, cannot be inflicted without judicial scrutiny. The Army can impose punishment, even the punishment of death, without judicial review.[17] Moreover the type of a discharge is not punishment in the sense that judicial process is required. No finding of guilt, no loss of liberty are involved. The penalty is the same as that which results from many unhappy experiences. Consideration of such "penalties" must begin in perspective. A discharge from civilian, commercial employment carries penalties in a real sense—stigma, loss of pay, difficulty in subsequent employment; but no one would suggest that an employer cannot discharge an employee without judicial scrutiny. A civilian employee of the Government can be dismissed upon charges of a criminal offense without judicial review.[18] The courts do not interfere in such matters. When the same "penalties" arise from action of military authorities, they do not thereby become "punishment" necessitating judicial action.

Stigma attaches on rejection from military service as a security risk. Indeed,

16. See Cole v. Young, 351 U.S. 536, 76 S.Ct. 861, 100 L.Ed. 1396 (1956); cf. Jason v. Summerfield, 94 U.S.App.D.C. 197, 214 F.2d 273 (D.C.Cir.1954), certiorari denied 348 U.S. 840, 75 S.Ct. 48, 99 L.Ed. 662 (1954).

17. Burns v. Wilson, 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953).

18. See, e. g., Eberlein v. United States, 257 U.S. 82, 42 S.Ct. 12, 66 L.Ed. 140 (1921).

if one be rejected entirely, on account of being a security risk, the adverse effects are greater than upon receiving a General Discharge Under Honorable Conditions. Many benefits attach to status under the latter which do not attach to rejection. And the intangibles of stigma attach in either event. Nevertheless it certainly cannot be urged that the Army may not reject, without judicial review, as a security risk one registered for service.

It is suggested that an honorable discharge is of so great value that a man can be denied one only if he be afforded a right to judicial review. To hold to that effect would be to vitiate the whole discharge process provided by the Secretary.[19] The courts have no authority to take such action. They cannot arrogate to themselves supervisory authority over the Army. Apt on this point is another quotation from Reaves v. Ainsworth, supra. The Supreme Court said:

"The courts have no power to review. The courts are not the only instrumentalities of government. They cannot command or regulate the army. To be promoted or to be retired may be the right of an officer, the value to him of his commission, but greater even than that is the welfare of the country, and, it may be, even its safety, through the efficiency of the army. * * * If it had been the intention of Congress to give to an officer the right to raise issues and controversies with the board upon the elements, physical and mental, of his qualifications for promotion and carry them over the head of the President to the courts, and there litigated, it may be, through a course of years, upon the assertion of error or injustice in the board's rulings or decisions, such intention would have been explicitly declared. The embarrassment of such a right to the service, indeed the detriment of it, may be imagined." [20]

There is a margin of value of an "Honorable Discharge" over a "General Discharge Under Honorable Conditions". But a considerable measure of value is involved in a Government job, such as was involved in Williams v. Cravens,[21] and in the rights of a contractor, such as were involved in Larson v. Domestic & Foreign Corp.,[22] and in a public utility business, such as was involved in Kansas City Power & Light Company v. McKay.[23] Yet in all these instances the holders of the rights were deprived of them without court review.

It is suggested that the consideration of pre-induction happenings is in conflict with the traditional policies of the Army. Most certainly we cannot order the Army to adhere to traditional practices. The armed forces in 1953–54 faced many new problems not involved in the operation of the military services of the 1770's, or the 1860's, or in 1917–18, or even in the early 1940's. Activity in the Communist movement now involves a possible conspiratorial participation dangerous to the security of this country. The efforts of this movement to infiltrate all parts of the Government pose new problems,

19. On March 18, 1954, Robert T. Stevens, then Secretary of the Army, told the Senate Armed Services Committee: "When the evidence fails to show that he is disloyal, or is subversive, but does establish that he is otherwise a security risk and should be eliminated, he is separated under honorable conditions, usually with a general discharge." Hearings on S. 3096, 83d Cong., 2d Sess. 75.

20. 219 U.S. at page 306, 31 S.Ct. at page 234.

21. 93 U.S.App.D.C. 380, 210 F.2d 874 (D.C.Cir.1954), certiorari denied Williams v. Robbins, 348 U.S. 819, 75 S.Ct. 30, 99 L.Ed. 646 (1954).

22. 337 U S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949).

23. 96 U.S.App.D.C. 273, 225 F.2d 924 (D.C.Cir.1955), certiorari denied 350 U. S. 884, 76 S.Ct. 137, 100 L.Ed. 780 (1955).

which must be met with new rules and regulations.

Harmon argues that the pre-induction events considered by the Army were political opinions and so could not validly be considered under the First Amendment. Activity in the world Communist movement has long since passed the boundaries of mere political opinion. It may well make a man a security risk, and, as we have pointed out, the courts cannot compel the Army to retain in its service a security risk.

 We come now to the second of Harmon's prayers, that the court direct the issuance to him of an honorable discharge. It is settled beyond question that the courts will not direct by *mandamus* any executive action which lies within the realm of executive discretion.[24] This is a rule of law quite apart from the peculiar insulation of Army affairs from judicial scrutiny. Harmon's prayer that the court direct the issuance to him of an honorable discharge is certainly a prayer for *mandamus,* and certainly the Congress has lodged within the area of executive discretion the selection of types of discharges to be given military personnel. So this prayer in Harmon's complaint does not lie within the jurisdiction of the court under the general rule applicable to all types of executive action. Even if such a prayer for mandatory direction ran only to a civilian matter which had none of the elements of a military affair, the courts would have no authority in respect to it.

Affirmed.

BAZELON, Circuit Judge (dissenting).

Appellant is a youth who was plucked out of civilian life and made a soldier, as are many others, at the threshold of the career he was planning for himself. Before the end of his term of service, he was restored to his civilian status, but hung about his neck was the millstone of "security risk." The Army has information about his civilian activities and associations on the basis of which it believes it would not be in the national interest to retain him as a soldier, but his military service is admitted to have been "excellent" and he is not claimed to have done anything illegal or reprehensible during his tour of duty. He does not challenge the discretion of the Secretary of the Army to judge whether the national security is served by dismissing a soldier. He complains only that, in the exercise of that discretion, there is neither necessity nor authority for inflicting upon him a gratuitous wound which may plague him all the rest of his days.

Appellant was inducted into the Army on October 31, 1952, as a draftee. On February 9, 1954, the Adjutant General of the Army informed him that the Army had received "derogatory" information about him and ordered him to reply thereto. He replied in writing on March 11, 1954. On April 2, 1954, the Adjutant General of the Army, acting by order of appellee, informed appellant that, upon review of the derogatory information and appellant's replies thereto, it had been determined that appellant would not be discharged under AR 615–370 as disloyal or subversive, but would be retained in his grade until completion of his service period, at which time he would receive a discharge "appropriate to the character of service" he had rendered.[1]

24. Anderson v. McKay, 94 U.S.App.D.C. 11, 211 F.2d 798 (D.C.Cir.1954), certiorari denied 348 U.S. 836, 75 S.Ct. 51, 99 L.Ed. 660 (1954). See discussion and cases cited in Clackamas County, Or. v. McKay, 94 U.S.App.D.C. 103, 219 F. 2d 479 (D.C.Cir.1954).

1. This comported with the traditional Army policy that the type of discharge be

governed entirely by the service record, absent some disqualification covered by specific regulation. Thus, though a less than honorable discharge certificate can be given to a homosexual, a drug addict, a chronic alcoholic, a habitual shirker, a person with psychopathic personalty, or a repeated petty offender (AR 635–208, formerly AR 615–368); to a de-

Five days later, the Secretary of Defense promulgated his Directive 5210.9, purporting to apply to military personnel the criteria of the civilian security program, Executive Order 10450, April 27, 1953, 18 Fed.Reg. 2489, and to authorize dismissal of a soldier as a security risk if "on all the available information it is determined that [his] retention is [not] clearly consistent with the interests of national security." On May 26, 1954, the determination to let appellant complete his service was reversed and he was informed that he would be given an "undesirable" discharge under AR 615–370 prior to the expiration of his service period. On June 2, 1954, he received such a discharge.[2]

Appellant sought unsuccessfully to have his discharge changed to "honorable," first by appeal to the Army Discharge Review Board and then, in turn, to the Army Board of Correction of Military Records and the Secretary of the Army. Having exhausted all possible administrative remedies, he commenced this suit seeking a declaration that his undesirable discharge was void and an order that it be changed to an honorable discharge. Cross-motions for summary judgment were made. The District Court, concluding that it lacked jurisdiction of the cause, denied appellant's motion and entered summary judgment against him. This appeal followed.

The derogatory information the Army had about appellant was that he had been employed at what was "reported to be a Communist operated camp"; that he had been employed by the Detroit Urban League, "reported to be a subversive organization"; that he had once "registered to vote in New York City with the American Labor Party * * * cited by the House Committee on Un-American Activities as being under Communist control * * *"; that he had solicited contributions for the defense of Smith Act prosecution defendants; that his father was reported to be a Communist and connected with various organizations cited as subversive by the Attorney General and to have registered many times with the American Labor Party; that his

---

serter, a soldier who has entered the Army by fraud, or one who is convicted of crime in a civil court (AR 635–206, formerly AR 615–366); or to one who is "determined by investigation to be disloyal or subversive" (AR 615–370, as implemented by Special Regs. 600–220–1); where there is no such fault, an honorable discharge is called for if the soldier's conduct has been rated at not less than "good" and his efficiency at not less than "fair" (AR 635–200, par. 8). Former Secretary of the Army Stevens told a Senate Committee:

"The traditional policy of the Army has been that the discharge given should reflect the service rendered. In other words, a man whose conduct has been faithful and honest during the time in the service would be entitled to separation under honorable conditions, notwithstanding what his conduct may have been prior to entering the service." Hearings, Senate Armed Services Committee on S. 3096, 83d Cong., 2d Sess., March 18, 1954, at p. 75.

2. Defense Directive 5210.9 provides that the separation report of a soldier discharged as a security risk "will cite as authority the appropriate Armed Service directive under which separation is ef-

fected." Par. VIII–F–6. On June 2, 1954, when appellant was given his undesirable discharge, there was no specific Army directive dealing with security risks. AR 615–370, which was cited in the separation report as authority for the discharge, permits an undesirable discharge only upon a determination that the soldier is "disloyal or subversive." No such determination having been made regarding appellant, AR 615–370 was inapplicable. Indeed, appellee asserts that it was cited by mistake, the real basis for appellant's discharge being Directive 5210.9 itself.

By the time the Army Discharge Review Board reviewed appellant's discharge on April 11, 1956, and upgraded it to "General," the Army had already promulgated its specific "Personnel Security Clearance" regulations, AR 604–10, July 29, 1955. But those new regulations were not cited in the corrected separation report as authority for the action. The only additional authority cited for the new action was "Sec. 301, P.L. 346" which is merely the provision for review procedure. 58 Stat. 286 (1944), 38 U.S.C.A. § 693h. Thus the only basis for appellant's discharge remains Defense Directive 5210.9.

step-mother had registered with the American Labor Party for about ten years; and that he associated with Communists or Communist sympathizers.[3] In his written reply of March 11, 1954, appellant admitted summer employment by the camp as a kitchen-helper and assistant breakfast cook and by the Urban League as a counselor in its camp for under-privileged negro children. Concerning registration with the American Labor Party, he had admitted it when first interrogated in May 1953,[4] and now added only that, since it was a legally recognized political party, he felt he could properly vote for it. Similarly, he had earlier admitted soliciting funds for the defense of two Smith Act indictees, and now merely added that he felt he had a right to do so. He denied that he was or had ever been a member of the Communist Party, but said that it was possible that he had known or been acquainted with Communists or sympathizers. The allegations concerning his parents he refused to reply to, as he had at his earlier interrogation. The District Court noted in its opinion that "Save for plaintiff's continuing association with his parents and for writing one letter requesting contribution for the legal defense of two persons indicted under the Smith Act, all charges against plaintiff were based on conduct antedating his induction into the Army."[5]

In his complaint, appellant alleged that his character and efficiency ratings had been "excellent." In his first answer, filed July 19, 1955, appellee admitted this allegation. On November 29, 1955, however, by amended answer, he pointed out that for about a week in July 1953 and for the period after April 24, 1954 (shortly before his discharge was ordered) appellant's rating was recorded as "unknown." But, under Army regulations, "ratings of 'unknown' and ratings for periods of less than two months are not 'disqualifying.' "[6]

Appellant also alleged that he was not and had never been a member of the Communist Party, or any Communist organization, or any organization advocating overthrow of the government or advocating or approving violence in denying others constitutional rights, or any organization seeking to alter our form of government by unconstitutional means, or any organization which, so far as he knew, had ever engaged in subversive activities. He also alleged that he was and always had been "completely and unswervingly loyal to the Government of the United States" and that he "would not hesitate to lay down his life in defense of the United States against any and all of its enemies whomsoever." Appellee denied these allegations, not on the ground that he believed them to be untrue but because of "lack of knowledge and information sufficient to form a belief" concerning them.

3. On May 7, 1953, the Army, without revealing this derogatory information to appellant, used it as the basis for interrogating him. On that occasion appellant denied that he was or had ever been a Communist or a member of any subversive organization, gave some details concerning persons about whom he was asked, described the circumstances under which he solicited funds for the defense of the Smith Act, 18 U.S.C.A. § 2385, defendants, and gave sundry other information. With respect to a number of questions, appellant invoked his privilege under the Fifth Amendment and under Article 31 of the Uniform Code of Military Justice, 64 Stat. 118, 50 U.S.C.A. § 602, against self-incrimination. He later explained that he had invoked his privilege as a result of fear and apprehension growing out of the circumstances of the interrogation and the fact that he was without counsel. The questions as to which he had invoked the privilege were put to him again in the February 9, 1954, order and he answered all of them, except those relating to his parents. As to those, his refusal was based not on privilege, but rather on "moral indignity [sic]," "filial piety," and the assertion that they were irrelevant.

4. Supra note 3.

5. Harmon v. Brucker, D.C.D.C.1956, 137 F.Supp. 475, 476.

6. AR 615–360, par. 8b.

Appellee's first contention is that we should not even reach the question whether the District Court correctly declined jurisdiction. He informs us that, after this appeal was filed, the Adjutant General notified appellant that the character of his discharge had been upgraded from "undesirable" to "General (under honorable conditions)" and he asserts that there is, therefore, no longer a judicially cognizable case or controversy.[7] This new form of discharge, however, is not the legal equivalent of the honorable discharge which appellant sought.

It may well be, as appellee states, that none of the benefits available to discharged soldiers under federal law are withdrawn from the holder of such a "general" discharge as this. Many benefits are conferred, however, by the statutes of the State of New York, where appellant resides, and those statutes all use the language "honorable discharge" or "honorably discharged." Although the New York courts have not decided whether this excludes holders of a discharge entitled "General (under honorable conditions)," the late Judge Frank of the Court of Appeals for the Second Circuit suggested that it would.[8] But whatever may be said of the technical legal equivalence or difference between the two types of discharge, from a real-life point of view they are vastly different. The portion of our population holding honorable discharge certificates from the armed services is now so great that an adverse reflection is inherent in a certificate which is other than "honorable."[9] This is, of course, confirmed by the statement of appellee's counsel in oral argument that "every soldier gets an honorable discharge unless there is some blemish on his record on account of which he receives a discharge other than honorable."

Nor is the new form of discharge defensible on the ground that the separation report does not on its face indicate that it was based on security considerations. The same observation could be made concerning the "undesirable" discharge. In both instances, however, a person sufficiently interested to check army regulations would discover the "security" character of the discharge. In the case of the "undesirable" discharge, the only reference to security was the citation of the "disloyal or subversive" regulation, AR 615–370, as the "Reason and Authority for Separation." The separation report accompanying the "General" discharge recited that "Para. 10, AR 615–120 applies." This regulation was cited, according to appellee, "to inform recruiting officers that appellant is ineligible for enlistment in the Regular Army."[10] As anyone may discover, this

---

7. The majority expresses no specific opinion as to this contention. It would seem, however, since the majority proceeds to deal with the question of the District Court's jurisdiction, that it rejected the contention that there is no longer a judicially cognizable case or controversy.

8. "Although a General Discharge (Under Honorable Conditions) apparently entitles a veteran to most, if not all, benefits under federal law, the statutes of New York, of which plaintiff is a resident, requires [sic] that a veteran have an Honorable Discharge in order to be eligible for various benefits under state law. See e. g. New York Military Law McK.Consol.Laws, c. 36, §§ 245, 250; New York General Municipal Law, McK.Consol.Laws, c. 24, § 148; New York Education Law, McK.Consol.Laws, c. 16, § 609; New York General Business

Law McK.Consol.Laws, c. 20, § 32." Schustack v. Herren, 2 Cir.1956, 234 F. 2d 134, 135 n. 2.

9. What the Supreme Court said in Wieman v. Updegraff, 1952, 344 U.S. 183, 190–191, 73 S.Ct. 215, 218, 97 L.Ed. 216, concerning the discharge of an employee on disloyalty grounds is, we think, not inapplicable here:
 "There can be no dispute about the consequences visited upon a person excluded from public employment on disloyalty grounds. In the view of the community, the stain is a deep one; indeed, it has become a badge of infamy. Especially is this so in time of cold war and hot emotions when 'each man begins to eye his neighbor as a possible enemy.'"

10. Compare, in this connection, Bailey v. Richardson, 1950, 86 U.S.App.D.C. 248, 257–258, 182 F.2d 46, 55–56, affirmed by

is a reference to AR 604–10, paragraph 15d, which provides:

"No applicant will be appointed or enlisted without the specific approval of the Secretary of the Army if his separation from previous service indicates that he was relieved from active duty or discharged either as a security risk or for reasons other than security while undergoing investigation under the provisions of these regulations or of corresponding security regulations issued by the other military departments. AR 615–120 applies with respect to former members of the armed services seeking enlistment or reenlistment in the Army."

See also Defense Department Directive 5210.9, par. II.

Our jurisdiction to entertain the appeal being unimpaired, the next question to consider is the District Court's ruling that, under our decision in Gentila v. Pace, 1951, 90 U.S.App.D.C. 75, 193 F.2d 924, it was "constrained" to disclaim jurisdiction of the cause.

"Stripped of self-contradiction and legal conclusions, all that [Gentila's] complaint allege[d]" was that his dishonorable discharge for desertion rested upon "an erroneous finding of fact" that he was mentally capable of forming an intent to desert. We held that "merely erroneous findings of fact by the Dis-

charge Review Board shall not be revised by a court." 90 U.S.App.D.C. at page 77, 193 F.2d at page 927. Although the District Court recognized that the instant case involved questions of law, it nevertheless thought Gentila controlling on the ground that both cases also involve "a review of the findings upon which the separation was based * * *." Harmon v. Brucker, D.C.D.C.1956, 137 F. Supp. 475, 477. In this the District Court was wrong. The "findings upon which the separation [in the present case] was based" are not challenged at all. Indeed, as the majority opinion points out, appellant does not challenge the appellee's power to remove him from the Army on mere suspicion that he is a security risk.[11] But, whether or not the interests of national security justify dismissing a soldier on mere suspicion, appellant claims that those interests are not served by branding such a soldier as a security risk as he passes through the gate.[12] The issue he raises is one of law: whether appellee may withhold an honorable discharge from a soldier whose conduct and efficiency ratings have never been less than "excellent," even assuming the correctness of all of the information appellee relies upon. That claim being "wholly dependent upon a question of law," it is within the jurisdiction of the District Court. United States v. Williams, 1929, 278 U.S. 255, 257–58, 49 S.Ct. 97, 98, 73 L.Ed. 314; Note, 70

an equally divided Court, 1951, 341 U.S. 918, 71 S.Ct. 669, 95 L.Ed. 1352, in which in sustaining the validity of the Government's civilian employee loyalty program, we pointed out that "mere dismissal from the Government service" is not punishment in the sense that permanent proscription from Government service had been held to be in United States v. Lovett, 1946, 328 U.S. 303, 316, 66 S.Ct. 1073, 90 L.Ed. 1252.

11. Cf. Bailey v. Richardson, supra note 10, 86 U.S.App.D.C. at page 263, 182 F.2d at page 61: "The Constitution does not require the President to continue to use in the training of Government personnel, the work performed by this appellant, a person whose loyalty to the

Government he suspects. There is no reason in the Constitution why the President should not limit the training staff to persons whose loyalty is beyond the faintest shadow of suspicion."

12. Even in the case of a civilian Government employee, who sought the position he holds, rather than being drafted, although we said that "mere dismissal" is not punishment and that there is no redress for injury suffered "in the process of dismissal," we recognized no authority to inflict gratuitous injury over and above the dismissal. Bailey v. Richardson, supra note 10, 86 U.S.App.D.C. at pages 257–258, 265, 182 F.2d at pages 55–56, 63.

Harv.L.Rev. 533, 539–40 (1957). Nothing in Gentila v. Pace, supra, is to the contrary. Nor can I accept it as settled (either by this court or the Supreme Court) that courts may not in circumstances like these review the issuance of a less than honorable discharge. As was pointed out in Schustack v. Herren, 2 Cir., 1956, 234 F.2d 134, 135 note 1, "The Supreme Court has not yet spoken on the question of 'whether and to what extent the courts have power to review or control the War Department's action in fixing the type of discharge certificates issued to soldiers [footnote omitted] * * *.' Patterson v. Lamb, 329 U.S. 539, 542, 67 S.Ct. 448, 449, 91 L.Ed. 485." In the footnote, the Supreme Court referred, among other authorities, to the decision of this court in Denby v. Berry, 1922, 51 App.D.C. 335, 279 F. 317, 320, reversed on other grounds, 1923, 263 U.S. 29, 44 S.Ct. 74, 68 L.Ed. 148. In that case we held "void and without authority of law" what we thought to be a discharge which did not comport with statutory procedure.[13] See also Davis v. Woodring, 1940, 72 U.S.App.D.C. 83, 85, 111 F.2d 523, 525.

That appellant seeks, in addition to a declaration that the discharge given

him was void, an order that he be given an honorable discharge does not, in my view, deprive the District Court of jurisdiction. If, upon review, the discharge given appellant is declared to be void, we must assume that the Secretary would issue a discharge which is not void. Denby v. Berry, supra. Moreover, if the District Court finds the denial of an honorable discharge to rest on legally insufficient grounds, it may, at least, enjoin a denial for such reasons. Perkins v. Elg, 1939, 307 U.S. 325, 349–350, 59 S.Ct. 884, 83 L.Ed. 1320; Shachtman v. Dulles, 1955, 96 U.S.App.D.C. 287, 294, 225 F.2d 938, 940.

Both parties request that we decide the merits of this controversy—namely, whether the Universal Military Training and Service Act of 1948, 62 Stat. 606, 50 U.S.C.A.Appendix, § 454(b),[14] pursuant to which Directive 5210.9 was promulgated, authorizes issuance of less than an "honorable discharge" certificate, in the circumstances of this case. But I think that since the District Court never reached consideration of the merits, sound judicial practice requires that it should first have that opportunity

13. Our decision was reversed by the Supreme Court upon the ground that what we considered a discharge was actually merely a transfer from active to inactive status, something wholly within the discretion of the commander-in-chief.

14. The statute sets the draftee's term of service at two years, "unless sooner released, transferred, or discharged in accordance with procedures prescribed by the Secretary of Defense * * *."