**Robert O. BLAND, Appellant**

v.

**John D. CONNALLY, Secretary of the Navy, and individually, Appellee.**

No. 15977.

United States Court of Appeals District of Columbia Circuit.

Submitted Feb. 14, 1961.

Decided June 15, 1961.

Petition for Rehearing Denied July 25, 1961.

Messrs. Kevin T. Maroney and Samuel L. Strother, Attys., Dept. of Justice, submitted on the brief for appellee.

Before Mr. Justice REED, retired,* WILBUR K. MILLER, Chief Judge, and WASHINGTON, Circuit Judge.

WASHINGTON, Circuit Judge.

This suit challenges the power of the Secretary of the Navy to issue a discharge "under conditions other than honorable" [1] to an inactive reservist for alleged subversive conduct engaged in while in inactive status, without permitting the reservist to confront the witnesses against him.

In 1942 appellant received a commission as an officer in the United States Naval Reserve and was called to active duty. His active service ended in 1946, when he was separated from active Navy duty "under honorable conditions" and transferred to inactive duty in the United States Naval Reserve. As an inactive reservist, appellant was not by law required to engage in any military activity, such as weekly drills or summer encampments, and in fact he has not done so.[2]

Mr. Robert O. Bland, appellant pro se, submitted on the brief.

---

* Sitting by designation pursuant to Section 294(a), Title 28, U.S.Code.

1. The type of discharge issued serves as a judgment upon the quality of the service rendered by the dischargee. There are five types of military discharge (other than for physical or mental disability): (1) honorable, (2) general (under honorable conditions), (3) undesirable (the equivalent for officers is a discharge "under other than honorable conditions"), (4) bad conduct (never issued to officers), and (5) dishonorable (a "dismissal" for officers). See BNA Government Security & Loyalty Manual 31:5 (1957). Types (4) and (5) are issued only upon sentence by court-martial; the others follow administrative action. Since about 90% of all discharges issued are honorable, a discharge of that type is commonly regarded as indicating acceptable, rather than exemplary service. In consequence, anything less than an honorable discharge is viewed as derogatory, and inevitably stigmatizes the recipient. See Note, 69 Yale L.J. 474, 492 (1960).

2. Unlike appellant, Ready Reservists who entered the service after August, 1955, are subject to the mandatory drilling requirement of the Reserve Forces Act of 1955, 10 U.S.C. § 270(a) (1), (2) (1958). Such persons are obligated to attend 48 night-time meetings and 2 weeks of summer field training each year for a specified number of years. See Graham, The Universal Military Obligation 9 (1958).

Up to the time of his discharge, appellant was subject to call to active service, without his consent, in the event of war or national emergency declared by Congress. 66 Stat. 489, 490, 50 U.S.C. § 961(a), (c) (1952) [now 10 U.S.C.A. § 672]. Reservists of his category were also required to undergo physical examinations at intervals, 66 Stat. 488, 50 U.S. C. § 949 (1952) [now 10 U.S.C.A. § 1004]; to secure permission if they desired to be employed by a foreign government, 66 Stat. 495, 50 U.S.C. § 982 (1952) [now 10 U.S.C.A. § 1032]; or to leave the United States for more than 30 days, or to change address outside the ter-

Appellant never became a member of any reserve component, and has never received any order or directive from the United States Navy since the time of his separation from active duty.

In December, 1955, the Commandant of the Eleventh Naval District sent to appellant a memorandum containing allegations charging that appellant had been a member of the Communist Party from 1947 to 1950, and had belonged to various other allegedly subversive groups in subsequent years.[3] The memorandum was accompanied by a narrative statement reciting appellant's allegedly subversive associations in the period subsequent to his separation from active duty, and by an extremely detailed nineteen point interrogatory.[4] Appellant was advised that his failure or refusal to respond to any of the charges made against him in the narrative statement, or to any interrogatory, would be considered as an admission of the truth of the matter asserted, and of all derogatory inferences flowing therefrom. There was also included a suggested form of resignation agreeing to accept a discharge "under other than honorable conditions." Bland failed to make any answer to the narrative statement or the interrogatories, and declined to tender a resignation in the form suggested.[5]

Shortly thereafter appellant demanded and was accorded a hearing before a local security board. At this hearing no evidence was adduced by the Navy in support of the allegations in the narrative statement. Appellant was offered, and expressly declined, an opportunity to produce witnesses to refute the charges made against him. Findings of fact were made by the board and approved by the Commandant of the Eleventh Naval District, and it was recommended that appellant be discharged "under conditions other than honorable."

These findings and recommendations were reviewed and affirmed without material change by the Bureau of Naval Personnel Security Review Board, and in consequence, on March 31, 1956, appellant was issued a discharge "under conditions other than honorable." Some months earlier, while this administrative review was pending, appellant had filed a complaint in the United States District Court for the Southern District of California, seeking to enjoin the administrative proceedings against him,

---

ritorial limits of the United States. Articles H–1804 and H–1802, Bureau Of Naval Personnel Manual (1947).

3. The activities and associations alleged are quite similar to those with which Pvt. Harmon was charged, in the leading case in this field, Harmon v. Brucker, 1957, 100 U.S.App.D.C. 190, 243 F. 2d 613, reversed 1958, 355 U.S. 579, 78 S.Ct. 433, 2 L.Ed.2d 503, the principal difference being that the charges against Harmon related to pre-induction conduct, while those against the appellant here are confined to the period following the completion of his term of active service.

4. Paragraph 9 fairly conveys the tenor of the interrogatory:
"9. There is reliable information that you attended a Marxist Institute Course at the Jefferson School of Social Science.
    a. When did you first become interested in the Jefferson School of Social Science in New York City? List the inclusive dates during which you attended the Jefferson School of Social Science. Who interested you in the activities of this organization? What courses of instruction were you given at this school? Describe in detail the subject matter covered by these courses.
    b. List the names and addresses of all individuals with whom you were closely associated while attending the Jefferson School of Social Science. List the names of all instructors who taught courses at this school.
    c. Since the Jefferson School of Social Science has been used as a means to subvert the minds of American Youth to the Communist ideology, what can be the justification for the continued existence of the Jefferson School of Social Science in the United States?"
There were also numerous inquiries relating to appellant's wife, demanding information concerning her political beliefs, ideas, associations and information, as well as his own.

5. On January 11, 1956, Bland filed a written offer to resign if given an honorable discharge, upon which no action has been taken.

and naming as defendants the Commandant of the Eleventh Naval District and the members of the local security board which had made the first adverse findings. The complaint included a prayer for a declaratory judgment that appellant "not be deprived of his status as an honorably separated veteran of World War II pursuant to any provisions of said SecNavinst 5521.6"—a reference to the relevant administrative regulation. The District Court denied an injunction and dismissed the complaint. On appeal, this action was affirmed by the Ninth Circuit. Bland v. Hartman, 1957, 245 F.2d 311.

Appellant then applied to the Navy Discharge Review Board, and later to the Navy Board for Correction of Naval Records. Both boards declined to change the character of his discharge to honorable. Finally, in December of 1959, Bland filed suit against the Secretary of the Navy in the United States District Court for the District of Columbia, seeking a declaration that the action of the Secretary was void, and a judgment directing the issuance of an honorable discharge. The Secretary's answer denied lack of authority, pleaded res judicata by reason of appellant's previous suit, and asserted that the District Court lacked jurisdiction over the subject matter. Motions for summary judgment were made by both parties. The District Court granted appellee's motion and denied that of appellant. This appeal followed.

### I.

▮ We turn first to the Government's contention that the decision of the Ninth Circuit in Bland v. Hartman, supra, is res judicata and bars the present action. We cannot agree. The action of the District Court for the Southern District of California appears to have been based in part on the fact that the defendants there named had completed their own functions in the matter and had referred the case to higher authority in the national capital, prior to the hearing on the prayer for an injunction. Under such circumstances, the denial of injunctive and declaratory relief can hardly be regarded as an abuse of discretion. The Ninth Circuit, in affirming, viewed the appeal from the dismissal of the complaint as premature, because no final judgment of dismissal had been entered by the District Court. As to the denial of the injunction, the court pointed out that Bland had failed to exhaust his administrative remedies. The action of the Ninth Circuit cannot, therefore, be viewed as precluding Bland from bringing this suit against the ultimate authority responsible for his discharge—the Secretary of the Navy—after he had exhausted his administrative remedies by applying to the Navy Discharge Review Board and the Navy Board for Correction of Naval Records. Restatement, Judgments § 54 (1942); cf. Gelpi v. Tugwell, 1 Cir., 1941, 123 F.2d 377.

### II.

▮ Coming now to the merits of the case, we must examine Bland's contention that the Secretary of the Navy is without authority to issue a punitive discharge to an inactive reservist on the basis of secret information relating to his associations subsequent to separation from active duty. No statute purporting expressly to vest such authority in the Secretary has been cited to us, and we think it clear that none exists. The question before us, then, is whether such authority exists by fair implication from general statutes, or by reason of the inherent nature of the military establishment.

The relevant administrative directives are contained in SecNavinst 5521.6, and its Appendix 3. These directives purport to authorize a uniform and undifferentiated standard for dismissal of all naval personnel, regular and reserve, active and inactive. Affiliation or association with any group listed in the Attorney General's list of questionable organizations, or sympathetic association with any member of such a group, is made a criterion for the application of the standard. Appendix 3, "Local Security Board Procedures," purports to

authorize consideration by board members of non-disclosable investigative files.

The Government relies principally upon three statutes as sources of authority for these directives:

(1) 10 U.S.C. § 6011 (1958) (formerly 34 U.S.C. § 591), which confers upon the Secretary of the Navy the power to issue regulations.

(2) 10 U.S.C. § 1163(a) and (c) (1958) (formerly 50 U.S.C. § 992(a) and (c)), which governs the separation of members of reserve components, and provides, in part, that a reserve officer with three years of service in that capacity cannot be involuntarily separated in the absence of "an approved recommendation of a board of officers convened by an authority designated by the Secretary concerned," and further that a reservist separated "for cause" shall be given a discharge under honorable conditions unless a less desirable form of discharge is effected pursuant to a sentence by court-martial or "the approved findings of a board of officers convened by an authority designated by the Secretary concerned."

(3) 10 U.S.C. § 1553(a) (1958) (formerly 38 U.S.C. § 693h), which provides for review within each service of the type and nature of military discharges, and specifically requires that "[s]uch review shall be based upon all available records of the military [formerly: service] department concerned * * *." The Supreme Court has construed this statute to mean that "the type of discharge to be issued is to be determined solely by the soldier's military record in the Army," and has held that the Secretary of the Army acted without statutory authority in issuing discharges in a form less than "honorable," where,

"[i]n so doing, he took into account pre-induction activities of petitioners rather than basing his action exclusively upon the record of their military service." Harmon v. Brucker, 1958, 355 U.S. 579, 78 S.Ct. 433, 435, 2 L.Ed.2d 503.

It will be seen that while these statutes do authorize the derogatory discharge of reservists "for cause" and the issuance of regulations by the Secretary of the Navy to carry out these powers, they confer no express authority to premise a derogatory discharge upon association with suspect groups or individuals. Also, while they do provide that a derogatory discharge must be based solely upon the military record of the dischargee, they confer no express power to establish the necessary facts by secret evidence.

Moreover, no implications of such powers have so far been found either by the Supreme Court or by this court. The Harmon case turned upon a threshold question; since the action there challenged rested upon an improper basis the Supreme Court did not find it necessary to determine what kind of factual situation would constitute a proper basis under the statutes, and, further, what procedures are requisite for properly establishing such a basis.[6] The two relevant decisions of this court, Olenick v. Brucker, 1959, 107 U.S.App.D.C. 5, 273 F.2d 819, and Davis v. Brucker, 1960, 107 U.S.App.D.C. 152, 275 F.2d 181, similarly treat only threshold questions. In the first case we set aside an order of the District Court granting summary judgment for the Secretary of the Army because of the absence from the record of any "approved findings of a board of officers" to support Olenick's "undesirable discharge," as required by 10 U.S.C. § 1163(c) (1). In the second case we

6. It is true that the Supreme Court, in reversing the judgment of this court in Harmon, expressly declined to rule upon the constitutional questions discussed in our majority opinion. We believe, however, that Harmon's discharge from the active army cannot be wholly equated with Bland's discharge from the inactive reserve: each must be judged on its own merits. On the effect of the Supreme Court's reversal upon the precedential value of the majority opinion of this court in Harmon, see Mitchell v. Covington Mills, 1955, 97 U.S.App.D.C. 165, 167, note 2, 229 F.2d 506, 508, note 2, certiorari denied 1956, 350 U.S. 1002, 76 S.Ct. 546, 100 L.Ed. 865.

reversed a grant of summary judgment because of the presence of a genuine issue of material fact, namely, whether preinduction conduct had been part of the basis for the derogatory discharge. In neither case did we reach the question whether the statutes confer authority upon the Secretaries of the military departments to promulgate regulations authorizing the issuance of derogatory discharges to reservists because of questionable associations while in inactive reserve status, allegedly proved by secret evidence.

Since in our view such a reading of the statutes would raise grave and hitherto unresolved constitutional questions involving basic First and Fifth Amendment rights, we are unable to conclude that an implication of authority necessary to sustain the administrative directives as here applied is warranted.[7] On the contrary, we believe that Greene v. McElroy, 1959, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377, explicitly directs us to refrain from deriving by implication authority to sustain administrative actions in the area of national security which raise serious constitutional questions.[8] The Supreme Court there said:

"Before we are asked to judge whether, in the context of security clearance cases, a person may be deprived of the right to follow his chosen profession without full hearings where accusers may be confronted, it must be made clear that the President or Congress, within their respective constitutional pow-

ers, specifically has decided that the imposed procedures are necessary and warranted and has authorized their use. [Citations] Such decisions cannot be assumed by acquiescence or non-action. [Citations] They must be made explicitly not only to assure that individuals are not deprived of cherished rights under procedures not actually authorized, [Citations] but also because explicit action, especially in areas of doubtful constitutionality, requires careful and purposeful consideration by those responsible for enacting and implementing our laws. Without explicit action by lawmakers, decisions of great constitutional import and effect would be relegated by default to administrators who, under our system of government, are not endowed with authority to decide them.

"Where administrative action has raised serious constitutional problems, the Court has assumed that Congress or the President intended to afford those affected by the action the traditional safeguards of due process. [Citations]" 360 U.S. at page 507, 79 S.Ct. at page 1419.

While we are not called upon to rule on constitutional questions of this sort here, we think that it is evident that the problems raised are not simple, and that any pat solutions must be rejected. As in every case involving a contest between a legitimate government interest (here, the integrity of the defense establish-

---

7. We believe that it is this court's duty, no less than the Supreme Court's duty, "to avoid deciding constitutional questions presented unless essential to proper disposition of a case." Harmon v. Brucker, 355 U.S. at page 581, 78 S.Ct. at page 435.

8. In Hannah v. Larche, 1960, 363 U.S. 420, 80 S.Ct. 1502, 1545, 4 L.Ed.2d 1307, the Supreme Court held that the Civil Rights Commission could properly adopt rules for the interrogation of witnesses which preserved the anonymity of complainants. But Hannah v. Larche cannot in any sense be deemed a retreat

from Greene. Greene is, in fact, expressly and carefully distinguished on two grounds: (1) the intent of Congress, in the civil rights legislation, to authorize investigative procedures without confrontation is manifest, and (2) where the governmental action challenged is not of a judicial nature, but is confined to information gathering, due process does not require confrontation. Justice Frankfurter, concurring separately, characterized Hannah as a case not involving the kind of "drastic official judgment" present in Greene, and presumably, present here as well.

ment) and a legitimate private interest (the right of the individual to procedural safeguards, and to freedom of expression and association) a balance must be struck.

The issue before us is not whether the military departments are required to meet certain substantive and procedural standards in order to purge themselves of potentially unreliable personnel. So far as we are here concerned, we must assume the Navy's right to separate any member for any cause and without hearing through a non-derogatory, "honorable" discharge. What is challenged is the right of the service to introduce the element of punishment or "labeling" into the involuntary separation, by characterizing the discharge derogatorily. The position of the dischargee is thus much stronger than that in Greene, supra, or in Bailey v. Richardson, 1950, 86 U.S. App.D.C. 248, 182 F.2d 46, affirmed by an equally-divided court 1951, 341 U.S. 918, 71 S.Ct. 669, 95 L.Ed. 1352. In those cases, as in this, it was asserted that the national security required that an individual against whom charges had been made be separated from his office or employment. But in Greene and Bailey the chief injury lay in the disruption of the employment relationship. Bland does not assert that he would be injured by being separated from the Navy, nor does he challenge the Navy's right to discharge him, so long as the discharge issued is "honorable." Unlike Greene and Bailey, this case presents a situation in which the Government can effect separation without injury to the person discharged.

What is at stake, therefore, is merely the Navy's right to punish or label, and not its right to secure itself against subversives. That is not to say that the power to punish or label is not itself a legitimate interest worthy of constitutional consideration. The deterrence of actually subversive contacts by inactive reservists and the need to prevent dilution of the value of an honorable discharge are both meritorious objectives. We do, however, find less merit in the argument that draftees will try to "bug out" of their obligations by feigning questionable associations if they know their discharges will nevertheless be honorable, since the principal obligation of an inactive reservist relates to a possible recall to service, an obligation not significantly different from that of the pre-inductee.

But were we to face the ultimate constitutional issue, we would be obligated to consider as well the adverse impact of the exercise of such a power upon the dischargee in a proceeding which does not permit him to know or confront the witnesses against him. We think it must be conceded that any discharge characterized as less than honorable will result in serious injury. It not only means the loss of numerous benefits in both the federal and state systems,[9] but it also results in an unmistakable social stigma which greatly limits the opportunities for both public and private civilian employment.[10]

Without attempting to resolve the constitutional question, we seriously doubt that the Constitution would condone the infliction of such injury, in the service of an interest so relatively weak, without the protection of the right of confrontation. In Greene, the Supreme Court said:

"Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must

9. See Brown, The Results of the Punitive Discharge, The JAG Journal 13 (January-February 1961); Note, 69 Yale L.J. 474, 490 (1960).

10. Job application forms almost universally require a statement as to military service and the type of discharge received; since about ninety per cent of the discharges issued are honorable, disclosure of discharge in any other form is ordinarily certain to produce further inquiry with predictable results.

be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination. They have ancient roots. They find expression in the Sixth Amendment which provides that in all criminal cases the accused shall enjoy the right 'to be confronted with the witnesses against him.' This Court has been zealous to protect these rights from erosion. It has spoken out not only in criminal cases, [Citations] but also in all types of cases where administrative and regulatory actions were under scrutiny. [Citations]" 360 U.S. at pages 496–497, 79 S.Ct. at page 1413.

The argument that confrontation has not heretofore been deemed essential in some types of military proceedings is not conclusive here. While we need not decide whether the status of the inactive reservist is more akin to that of the civilian than that of the soldier, we can and do take note of the ambiguity which attaches to that status. Even if it were clear and certain that a soldier on active duty is in no circumstances constitutionally entitled to the right of confrontation, and we think this proposition is far from clear, see Burns v. Wilson, 1953, 346 U.S. 137, 152, 73 S.Ct. 1045, 97 L.Ed. 1508 (dissent), we would not be prepared to say that the rights of a reservist, who is not required by law to perform any active military service except upon call and who, never having been called to serve, does not in fact do so, are no greater. The constitutional provisions which partially exempt the military from the procedural requirements of the Bill of Rights are neither arbitrary nor total. They are grounded, rather, upon the exigencies of military life—exigencies hardly present here. Great changes have occurred in the nature of our defense establishment. The Army which the Founders partially exempted from the Bill of Rights was a small group made up of a relatively few professionals, reportedly numbering only 672 soldiers in August, 1789, while today the vast bulk of the male citizenry of this country passes at one time or another through the national military establishment. See Wiener, Courts Martial and the Bill of Rights, 72 Harv.L.Rev. 1, at 9, 266, 301 (1958). Moreover, while the contrast between wartime and peacetime is no longer as clear as it once was, we are unable to conclude that meaningful distinctions no longer exist, and that the Congress has not been as cognizant of these distinctions as the rest of the community.

It appears from the record before us that the Government's desire to utilize confidential informers does not arise from a military necessity as such; there is no serious suggestion that confrontation would require the disclosure of military secrets. In this regard, the use of secret evidence in cases like the present is no different from, and no more defensible than, that condemned in Greene.

One last consideration relates to the substantive nature of the conduct punished. The political freedoms—association and expression—occupy a unique status. Legislative acts which infringe them must be justified by the gravity of the evil to be avoided, discounted by the availability *vel non* of other ways of dealing with the evil.[11] Had Congress expressly authorized the actions here challenged, we would be obliged to apply this calculus and to enter upon an inquiry into the justification for restricting such basic liberties. But we do not think that we should presume that Congress meant to raise such questions, or that it intended to invade the area of political free-

---

11. See the formulation in United States v. Dennis, 2 Cir., 1950, 183 F.2d 201, 212, affirmed 1951, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137.

dom, where it failed to do so expressly. For these reasons we think that the extension of statutory authority by implication is not permissible, and we are therefore bound to reverse the judgment of the District Court. The case will be remanded to the District Court for further proceedings not inconsistent with this opinion. While we need not examine the exact scope of the relief to which Bland is or may become entitled, it would appear that in any event he is entitled to have the discharge he has been given declared to be void. He is also entitled to insist that any future administrative proceedings against him be conducted with the procedural safeguards referred to in this opinion.

So ordered.