**Sylvia BENNETT**

v.

**The UNITED STATES.**

**No. 204-64.**

United States Court of Claims.

Feb. 18, 1966.

Thomas A. Ziebarth, Washington, D. C., for plaintiff; Carl L. Shipley, Shipley, Akerman & Pickett, Washington, D. C., and Samuel Resnicoff, New York City, of counsel.

Manfred J. Schmidt, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

COWEN, Chief Judge.

In February 1963, plaintiff was hired by the Department of the Navy as a clerk-typist with the Inspector of Naval Material at Newark, New Jersey. This was a career-conditional appointment calling for a one-year probationary period. As part of her application for the position, plaintiff had to answer a form questionnaire (Form 85, "Security Investigation Data for Non-sensitive Position") inquiring as to "organizations with which affiliated (past and present) other than religious or political organizations or those which show religious or political affiliations." Her reply to this question was "none."

On June 21, 1963, plaintiff was notified by the Navy that it proposed to separate her, during the probationary period, on the ground of

* * * deliberate falsification of appointment papers in that you did not acknowledge membership in the International Workers Order. In-

formation made available to this activity indicates that you were a member of this organization from 12 February 1950 until March 1951. Your certificate number as a member of Local 517 JA was 418008. Standard Form 85 which you completed on 25 February 1963 reflected the answer of "none" to question 8, "Organizations with which affiliated (past and present) other than religious or political organizations or those which show religious or political affiliation." Your answer of this essential information is considered to be a serious action as your signature on the SF 85 was preceded by the certificate that "I certify that the above statements are true, complete, and correct to the best of my knowledge and belief, and are made in good faith." This certification admonishes that a false statement on the form is punishable by law.[1]

Plaintiff, who was given 5 days to file a written response, wrote on June 25 that she categorically denied the charges. On June 27, the Navy replied that her answer did not controvert the information available to the agency and that it proposed to remove her as of July 5, 1963. Plaintiff then employed an attorney, who by letter of July 2 to the Navy, requested that the order of discharge be rescinded and that she be granted a hearing on the charges. The request was denied and the plaintiff was removed on July 5, 1963. Plaintiff's timely appeals to the Civil Service Commission and to its Board of Appeals and Review were dismissed on the ground that the Navy had

complied with all the procedural requirements of the laws and regulations applicable to probationary employees.

At the time of her discharge, plaintiff was still serving in her probationary period, was not protected by the Lloyd-LaFollette Act, 5 U.S.C. § 652, and, in the absence of regulations preventing such action, might have been discharged without the assignment of any reason therefor. Nadelhaft v. United States, 131 F.Supp. 930, 132 Ct.Cl. 316 (1955). However, both the Civil Service Commission and the Navy had promulgated regulations respecting the discharge of probationary employees and it is not open to question that her discharge was invalid if it was not effected in compliance with such regulations. Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959), and Watson v. United States, 162 F.Supp. 755, 142 Ct.Cl. 749 (1958).

Against this background of decisional law, two questions are presented by our determination: (1) whether the notice of proposed removal served on plaintiff conformed with the provisions of the governing regulations and (2) whether the employing agency's refusal to grant plaintiff's request for a hearing was a violation of such regulations.

### THE NOTICE OF PROPOSED REMOVAL

At the time of plaintiff's discharge, Navy regulations (Navy Civilian Personnel Instruction (NCPI) 352, Section 4–8(c)(1)(b)) provided that, where a probationer was to be separated for

---

1. The International Workers Order (referred to in the notice) was included in the Attorney General's list of subversive organizations furnished to the Loyalty Review Board of the Civil Service Commission. See Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951), International Workers Order, Inc. v. McGrath, 86 U.S.App.D.C. 287, 182 F.2d 368 (1950). The Superintendent of Insurance of the State of New York brought suit to dissolve the Order, and its liquidation was upheld by the New York Court of Ap-

peals in a decision which referred to the Order's 'continued course of political action, involving as it did financing Communist Party organizers and publications disseminating Party literature, and supporting Communist policies and candidates for public office * * *." In re People by Bohlinger, Superintendent of Insurance, Appeal of International Workers Order, Inc., 305 N.Y. 258, 112 N.E.2d 280 (1953), cert. denied, International Workers Order, Inc. v. People of the State of New York, 346 U.S. 857, 74 S.Ct. 68, 98 L.Ed. 371 (1953).

"pre-appointment" conditions, he was "entitled", among other things, to "specific and detailed reasons." This was defined (NCPI 352, Section 4–8(a) (2)) as "all the facts needed to enable him to understand the reasons for the proposed action and to join issue with it." The Civil Service Commission's regulations (5 CFR § 2.301(c) (2) and 5 CFR § 22.-302(a) (1963 Supp.)) imposed a similar requirement: *"Notice of proposed adverse action.* An employee against whom adverse action is sought shall be given advance written notice stating the reasons, specifically and in detail, for the proposed action."

When the language of the notice of proposed removal is matched against the provisions of the regulations, we cannot but conclude that there was almost a literal compliance with the regulations. First, plaintiff was informed that she was charged with a deliberate falsification in her appointment papers by failing to acknowledge therein her membership in the International Workers Order. Second, the detailed facts regarding her membership were supplied by statements that the period of her membership extended from February 12, 1950 to March 1951, that she was a member of Local Chapter 517 of the Order, and that her membership certificate number was 418008. Third, the seriousness of the charge and the reasons for her proposed separation were explained by a reference to the certification she signed when she applied for employment and a reminder that the certification form admonished her that a false statement was punishable by law.

Was the notice sufficient to enable plaintiff to understand the reasons for the proposed separation and to join issue with them? In our opinion, her answer to the charges and the letter subsequently submitted by her attorney show quite clearly that it was. Her answer denied that she had ever been a member of the Order, disclaimed any knowledge of the local chapter or certificate number identified in the notice, and declared that during the period of her alleged member-

ship most of her time had been spent in going to doctors who were treating her for a kidney infection. The letter sent by plaintiff's attorney to the Navy stated in pertinent part:

My client categorically denies membership in the International Workers Order. She never paid dues, and never attended any meetings. Her registration with the Board of Elections will reflect her status as an enrolled Democrat.

The charges which have been preferred against Mrs. Bennett, to wit; a deliberate falsification, etc., and alleged membership in a subversive organization are serious. The stigma of a dismissal predicated upon such charges would be extremely serious in its implications. As a probationary employee, Mrs. Bennett has no tenure. However, to avoid a gross miscarriage of justice, it is requested that her summary dismissal as of 5 July be rescinded, and held in abeyance pending a Hearing on said charges. There is the possibility of mistaken names.

Will you please, therefore, rescind the dismissal and schedule a Hearing. May I suggest that my office be contacted so that a mutually convenient Hearing date may be arranged. Since time is of the essence, I am writing you directly.

Thus the issue was joined. It is significant that neither plaintiff nor her attorney complained about the inadequacy of the information contained in the notice of proposed separation and that no request was made for a more detailed statement of the reasons for the contemplated removal. If plaintiff's attorney felt that the information supplied in the notice was not sufficiently detailed, it would appear that he would have asked for a more complete statement in preparation for his representation of plaintiff at the hearing he had requested. Under the tests laid down by this court in Engelhardt v. United States, 125 Ct.Cl. 603 (1953) and Sells v. United

States, 146 Ct.Cl. 1 (1959), the notice served on plaintiff complied with the regulations.

In urging that the notice of proposed removal lacked the specificity required by the regulations, plaintiff takes the position that the employing agency was bound to "disclose its entire case." The adoption of this position would require the court to amend the regulations by adding a mandate which cannot be found, expressly or by reasonable implication, within the four corners of their provisions. Plaintiff's reading of the regulations calls for much more than the specific reasons for the proposed separation; it compels a disclosure of all of the details of the security investigation from which the facts stated in the notice were derived. Included in the information which plaintiff says the Navy was obligated under its own regulations to furnish her were the names of those who supplied the information to the Navy, plus a showing that such information was reliable. Such an interpretation of the regulations would require the Navy not only to submit to plaintiff the report of the security investigation upon which the charge was based, but to divulge the names of confidential informants and to place other confidential information at plaintiff's disposal.[2] As indicated above, we find no basis for engrafting such an additional requirement on the provisions of the regulations.

### THE RIGHT TO A HEARING

Plaintiff's principal point is that Commission regulation 5 C.F.R. Section 2.301(c) (2) implicitly required the employing agency to offer a hearing to all probationers separated for "pre-appointment" reasons, and that the Navy was required to comply with that policy, despite the Navy's omission of a right to a hearing (for trial-period employees) from its own personnel regulations. The part of Section 2.301(c) (2) on which plaintiff relies says that the removal "action shall be processed in the same manner as actions taken under Subpart C of Part 22 of this Chapter and the employee shall have the right of appeal provided in § 22.304 of that subpart." [3] Subpart C of Part 22 deals with suspensions of 30 days or less, and covers various types of employees, including the career and career-conditional classes; it does *not* require a hearing. However, the Navy, with respect to *non-probationary* employees only, has gone beyond the Commission's demands and has itself granted the right to a hearing on suspensions of 30 days or less, Navy Civilian Personnel Instruction (NCPI) 750, Section 5-4. It is clear that the Navy did not desire to extend this hearing-right to probationers; (NCPI) 750, Section 5-5 (a), 5-4(a), and 5-3(a) expressly declare that employees "serving a probationary or trial period" are excluded from the category entitled to a hearing.

But, plaintiff argues, the Navy was forced by the Commission's regulations to give the same procedural rights to probationers charged with "pre-appointment" defaults as it gave to career employees faced with a suspension of 30 days or less. We read the Commission's regulation differently. The Commission directed that trial-period employees be granted the same rights as the *Commission* required, in suspension cases, for the other kinds of workers. The regulation had nothing to say about additional protections that agencies might see fit to afford. The Navy could, as it did, give hearings to non-probationers while ad-

---

2. In Vitarelli v. Seaton, supra, the Supreme Court expressly avoided a decision on the question of the constitutional permissibility of an administrative adjudication based on "confidential information" not disclosed to the employee. See footnote 2 on page 540 of the opinion, 79 S.Ct. on page 973.

3. In full text, 5 C.F.R. § 2.301(c) (2) (1963 Supp.) provides: "If an agency decides to terminate an employee during the probationary or trial period for reasons based in whole or in part on conditions arising before his appointment, the action shall be processed in the same manner as actions taken under Subpart C of Part 22 of this Chapter and the employee shall have the right of appeal provided in § 22.304 of that subpart."

hering to the Commission's minimum for plaintiff's class.

### CONCLUSION

Although the regulations authorized plaintiff to furnish affidavits in support of her answer, none were submitted. If an effort was made by plaintiff or her attorney to obtain evidence from the former officials of Local 517 of the International Workers Order in support of her denial, it is not disclosed in the record. The proceedings that followed the receipt of her answer to the charge were in strict conformity with the regulations. The finding of the Civil Service Commission that the Navy had complied with all of the procedural requirements of the law and regulations is, we think, fully supported by the record and should be upheld. The Navy did all that was required of it by the decisions in Service v. Dulles, supra, and Vitarelli v. Seaton, supra—the two recent Supreme Court decisions which we consider are applicable to the discharge of a probationary Government employee under the factual circumstances before us.

■ Regardless of doubts we may harbor about the truth or falsity of the charge made against plaintiff and a natural impulse to see the issue resolved in a full and fair hearing, the law, as long ago expounded by this court and the Supreme Court, limits our jurisdiction in such cases to a review of the question as to whether there has been a compliance with the applicable statutes and regulations. It is true, as stated in the letter sent by plaintiff's attorney to the Navy, that a stigma attaches to a dismissal for alleged membership in a subversive organization. However, the rule has been applied in other cases involving discharged Government employees where a stigma attached to the causes for dismissal, namely, charges involving offenses of serious moral turpitude, Eberlein v. United States, 53 Ct.Cl. 466 (1918), aff'd 257 U.S. 82, 42 S.Ct. 12, 66 L.Ed. 140 (1921)—accepting bribes; Kent v. United States, 105 Ct.Cl. 280 (1946)—malfeasance in office, and Gold-

ing v. United States, 78 Ct.Cl. 682 (1934) cert. denied, 292 U.S. 643, 54 S.Ct. 776, 78 L.Ed. 1494—repeated attempts at seduction by force. As the Supreme Court said in Eberlein v. United States, supra:

> There can be no question from the findings in this case that the plaintiff had the benefit of a hearing according to the regulations then in force. The Court of Claims in its opinion stated that the subsequent investigation established his innocence of the charges made against him. But the things required by law and regulations, were done, and the discretion of the authorized officers was exercised as required by law. It is settled that in such cases the action of executive officers is not subject to revision in the courts. Keim v. United States, 177 U.S. 290, 20 S.Ct. 574, 44 L.Ed. 774.

For the reasons stated, defendant's motion for summary judgment is granted, plaintiff's cross-motion for summary judgment is denied, and plaintiff's petition is dismissed.

DAVIS, Judge (dissenting):

There is no doubt that the charge of falsification made against plaintiff had major security implications, with strong overtones of subversion. She was accused of having lied in 1963 (on a "security investigation data" questionnaire) as to membership in the International Workers Order in 1950–1951. As the court notes, that organization was included in the Attorney General's list of Communist and subversive groups supplied to the then Loyalty Review Board of the Civil Service Commission. The IWO was also one of the three petitioners in the Supreme Court litigation challenging the Attorney General's list—the case familiarly known as Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (see the starred footnote, and International Workers Order, Inc. v. McGrath, 86 U.S.App.D.C. 287, 182 F.2d 368 (1950)). The Superintendent of Insurance of the State of New York, assert-

ing that the Order was Communist-dominated, brought suit to dissolve it. In upholding the liquidation, the New York Court of Appeals referred to the Order's "continued course of political action, involving as it did financing Communist Party organizers and publications disseminating Party literature, and supporting Communist policies and candidates for public office * * *." In re People by Bohlinger, Superintendent of Insurance, 305 N.Y. 258, 112 N.E.2d 280 (1953), cert. denied, International Workers Order, Inc. v. People of State of New York, 346 U.S. 857, 74 S.Ct. 68, 98 L.Ed. 371. The history of that period reflects the continued insistence of the Executive Branch of the Federal Government that the IWO was a subversive organization, controlled and infiltrated by the Communist Party. The plaintiff's attorney understood this at once. His initial communication to the Navy (the letter of July 2nd which the court quotes) read the charge as being the "deliberate falsification, etc., and alleged membership in a subversive organization * * *." He specifically adverted to "the stigma of a dismissal predicated upon such charges * * *."

A year ago, in Garrott v. United States, 169 Ct.Cl. 186, 340 F.2d 615 (1965), this court—following Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959)—applied the principle that there are special considerations governing federal administrative proceedings which involve charges of lack of security or of disloyalty. In Garrott the demand was for a trial-type hearing, and the court stated that "an agency of the Federal Government cannot, without permitting cross-examination and confrontation of adverse witnesses, take detrimental action against a person's substantial interests on loyalty or security grounds—unless, at the least, Congress (or the President, if he is the source of power) has expressly authorized the lesser procedure." 340 F.2d at 618. To the same effect were Bland v. Connally, 110 U.S. App.D.C. 375, 293 F.2d 852 (1961) and Davis v. Stahr, 110 U.S.App.D.C. 383,

293 F.2d 860 (1961). The basic reasons for this singling out of security and loyalty charges pervade beyond the presumptive requirement for a fuller trial. As the Supreme Court said in Cole v. Young, 351 U.S. 536, 546, 76 S.Ct. 861, 868, 100 L.Ed. 1396 (1956), "in view of the stigma attached to persons dismissed on loyalty [or subversive-security] grounds, the need for procedural safeguards seems even greater than in other cases * * *." See, also, Wieman v. Updegraff, 344 U.S. 183, 186–191, 73 S.Ct. 215, 97 L.Ed. 216 (1952); Peters v. Hobby, 349 U.S. 331, 347, 75 S.Ct. 790, 99 L.Ed. 1129 (1955); Cafeteria and Restaurant Workers Union, etc. v. McElroy, 367 U.S. 886, 898–899, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). And there are peculiar difficulties in disproving an accusation of subversive membership or affiliation (particularly when, as here, more than a decade has elapsed) which add to the need for ampler protection; these charges often rest solely on investigative reports founded on summaries of unnamed informants "whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy"; many times, the possibility of a mistake in identity is not far-fetched. See Greene v. McElroy, supra, 360 U.S. at 496, 497–499, 79 S.Ct. at 1413; Vitarelli v. Seaton, 359 U.S. 535, 540, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); Peters v. Hobby, supra, 349 U.S. at 334–336, 75 S.Ct. 790; Cole v. Young, supra, 351 U.S. at 540, 76 S.Ct. 861. These special factors concern not only the need for confrontation at a trial or hearing; they also influence various other steps in the administrative process. Certainly they have a direct impact upon the formulation of the charge, especially if the individual is not to be granted a hearing but must rest his defense purely on a written response to the formal complaint against him. See Vitarelli v. Seaton, supra, at 541–546, 79 S.Ct. 968.

As the court points out, the Navy's general regulations for dismissing a probationary employee "for reasons based on

conditions that existed before appointment" required the laying out in the charge of "specific and detailed reasons" giving "all the facts needed to enable him to understand the reasons for the proposed action and to join issue with it." All that plaintiff was told was that she had lied as to membership, over 10 years before, in the IWO, and that she had been a member of a certain local (the situs of which was not given) and held a designated certificate number. Perhaps this sort of summary statement would have been sufficient if she had been accused of lying as to past membership in Phi Beta Kappa (if such an accusation could conceivably be made). I think, however, that, in the light of the greater need for procedural safeguards in security and loyalty cases, more details should have been proffered when an allegedly subversive group like the IWO was so directly implicated, particularly since that organization had been dissolved several years before plaintiff answered the Navy's security questionnaire in 1963, and since her alleged membership was said to have been in 1950–1951 (about twelve years before). In this context, the content of the phrase "specific and detailed reasons" meant that plaintiff should have received some better statement as to the location of the "local", the persons or sources said to have provided the information to the Government, any documentary backing for the charge (such as an IWO membership list, a membership card in plaintiff's writing or name, or a prior admission by her of membership), the nature of her purported membership, or the like. Only in that way would Mrs. Bennett have obtained *"all the facts* needed to enable * * * [her] to understand the reasons for the proposed action and *to join issue* with it" —to which, as the Navy regulation declares, she was "entitled" (emphasis added). To "join issue" intelligently with a security-colored indictment of this kind she would have to have something more than the cryptic few lines handed to her.

She knew, of course, that she was accused of lying as to membership for a defined period in a specified local of the IWO, and that she was said to have held a certain membership number. But if we presuppose her innocence—as we must when we pass on the validity of the charge—it is hard to see how she could "join issue" with so general an indictment, except by the futile gesture of offering a wholesale denial, as she did.[1] The IWO was a nation-wide organization with units in many places, but she was not told the city or state of the specified local. She was not told whether she was alleged to have been an officer or merely a rank-and-file member. She was not told whether her membership was said to have been active or inactive. She was not given the nature of her activities, if any. Since the IWO had been dissolved some years prior to 1963, there was no reasonable way for her to find out from it any of this information, even the location of Local 517 JA or the named holder of certificate #418008—assuming that this group, charged with Communist domination, would supply any information to her if it still existed. Since the asserted membership lay far back in 1950–1951, it is highly probable that, in the absence of some fuller indication of the specific reasons for the Navy's belief that she lied, an innocent accused would, at the best, have extreme difficulty, in 1963, in proving by any independent evidence, outside of her own denial, the negative proposition that she had not been a member of this particular organization. I cannot believe that a summary charge that plaintiff had been a member of such-and-such a "local" of the Communist Party twelve years before would withstand challenge. The accusa-

---

1. Her answer of June 25th said that she "categorically" denied the charges and that she had told the truth in answer to the question on the security form. In particular, she "attested" that she had never been a member of the International Workers Order; that she was not a member from February 12, 1950 to March 1951; that she had no knowledge of any Local 517 JA; and no knowledge of certificate of membership #418008.

tion actually made against her was not one whit better. Only the barest minimum was given, not the Navy's requirement of "specific and detailed reasons" giving "all the facts needed to enable [her] to understand the reasons for the proposed action and to join issue with it."

Plaintiff adequately raised this point that the charge lacked the required specificity. Her attorney's request (on July 2, 1963) that "her summary dismissal as of 5 July be rescinded, and held in abeyance pending a Hearing on said charges" —taken together with his reference to "a gross miscarriage of justice" and "the possibility of mistaken names", as well as his recognition that the charge had a serious subversive-security aspect—was surely enough to put the Navy on notice that further details and more information were sought. It is clear that he felt unable to disprove the charge without some greater specificity. The Civil Service Commission passed on the issue and held that "specific reasons" were given. In this court, the petition claims that "the advance notice and final decision of the agency failed to set forth all the facts, specifically and in detail, needed to enable plaintiff to understand the reasons for the proposed action and the dismissal and to join issue therewith in violation of NCPI 352, Section 4–8c." Plaintiff's brief in this court argues, as one of its points, that "the notice of proposed removal did not set forth 'specific and detailed reasons' as required under Navy personnel regulations." Defendant contends that the charge was sufficient but does not urge that the point has been waived (or is not presented).

We should have no difficulty in reading the general phrases of the Navy and Civil Service Commission regulations as calling for more precision in this class of case than perhaps in others. By its very nature the term "specific and detailed reasons" is elastic, its scope dependent on the needs of the individual case or category of charge. We ourselves have

said that the "manifest purpose" of this type of "provision is to afford the employee a *fair opportunity* to oppose his removal, and the charges must be considered with the view of determining whether plaintiff was informed of the basis of the proposed action with *sufficient particularity* to apprise him of allegations he must refute or acts he must justify. The technical rules of criminal proceedings are not applicable here, *and the facts and circumstances of a particular case are regarded as important in such an inquiry.*" Engelhardt v. United States, 125 Ct.Cl. 603, 606 (1953) (emphasis added). The courts, moreover, have not hesitated to construe statutes or regulations bearing on security (or loyalty) in the light of the distinctive requirements of that type of litigation. See Peters v. Hobby, Cole v. Young, Greene v. McElroy, Vitarelli v. Seaton, Bland v. Connally, Davis v. Stahr, and Garrott v. United States, all cited supra.

These decisions also show that the principle that there is potentially a greater need for procedural safeguards in subversive-security and loyalty cases is not restricted to (i) persons holding sensitive posts, or (ii) those directly discharged for subversive affiliations (rather than for lying about them, as was plaintiff). Cole v. Young, which explicitly recognized this principle, as well as Peters v. Hobby and Vitarelli v. Seaton, concerned employees in non-sensitive positions, as did Bland v. Connally (inactive Navy reservist) and Davis v. Stahr (inactive Army reservist); the plaintiff in Garrott v. United States was a retired federal employee who had been a routine post-office worker; of the group, only Greene v. McElroy involved the holder of sensitive employment. The courts have considered the need for additional protections to be at least as great where the security charge is lodged against a non-sensitive employee (like plaintiff) as when he is an engineer in a defense plant. The problems inherent in the accusation—the stigma and the difficulties of disproof—are of the same

order; on the other hand, the Government's need to dispense with the employee's services is less. See Cole v. Young, supra, 351 U.S. at 546–547, 76 S.Ct. 861, 100 L.Ed. 1396. Similarly, *Garrott* demonstrates that a charge of lying as to subversive connections is as much within the security area as a direct effort to impose sanctions because of such membership; Garrott's annuity was cut off because it was said that he had lied as to membership in the Communist Party. No one would deny that the criminal proceeding against Alger Hiss was a security case even though the formal charge was perjury. United States v. Hiss, 185 F.2d 822 (C.A.2, 1950), cert. denied, 340 U.S. 948, 71 S.Ct. 532, 95 L. Ed. 683 (1951).

Plaintiff's probationary status does not remove her from the sphere of the *Greene* principle. She was not shielded by any Congressional directive, and, if the Civil Service Commission and the Navy had not promulgated their regulations granting rights to probationary employees, she could have been dismissed without any assigned reason. Cafeteria and Restaurant Workers Union etc. v. McElroy, supra, 367 U.S. at 896–897, 81 S.Ct. 1743, 6 L.Ed.2d 1230; Batchelor v. United States, 169 Ct.Cl. 180 (1965), cert. denied, 382 U.S. 870, 86 S.Ct. 147, 15 L.Ed.2d 109. But these regulations had been issued and were outstanding; as we have many times held and the court agrees today, she could insist that they be enforced—despite the absence of personnel-removal legislation specifically extending to probationers. See Vitarelli v. Seaton, 359 U.S. 535, 539–540, 545, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); Watson v. United States, 162 F.Supp. 755, 142 Ct.Cl. 749 (1958); Daub v. United States, 292 F.2d 895, 897–898, 154 Ct.Cl. 434, 437–438 (1961); Greenway v. United States, 163 Ct.Cl. 72, 75–76 (1963). In applying and interpreting the regulations there is no reason why the factors which have moved the courts in subversive-security cases of the past decade should be disregarded. The stigma and the hazards of a security accusation are the same for a probationary employee as for others. True, the novice has not yet acquired an interest in a permanent or established job, but the Executive has acknowledged, through the promulgation of regulations safeguarding the tentative position while it is still tentative, that the employee-on-trial has an existing and a potential interest in federal employment. That gratuitous grant must be recognized "even though without * * * [the] regulations * * * [the Navy] could have discharged petitioner summarily", and "even though [the regulations were] generous beyond the requirements that bind such agency." Vitarelli v. Seaton, supra, 359 U.S. at 540, 547, 79 S.Ct. at 976. The Navy elected to issue the regulations and to proceed against Mrs. Bennett on what were, in effect, security grounds. As Mr. Justice Frankfurter observed, concurring in *Vitarelli*, "[h]e that takes the procedural sword shall perish with that sword" because "[a]n executive agency must be rigorously held to the standards by which it professes its action to be judged" (id., at 546–547, 79 S.Ct. at 976).

I would hold, therefore, that plaintiff was denied her right under the regulations to "specific and detailed reasons" and that her discharge was unlawful for that reason.[2] I need not consider whether she was also entitled to a hearing, on the special ground that the discharge was security-based, although the regulations did not purport to accord her that right (cf. Greene v. McElroy, supra; Garrott v. United States, supra); she has not raised or pressed that claim in this court. She does say that she was entitled to a hearing, but her argument is a general one applicable to all probationary employees charged with any kind of "pre-appointment" delinquency; her conten-

2. On this view, plaintiff is entitled to recover her pay from the date of her removal, less offsets. See Hanifan v. United States, Ct.Cl., decided Dec. 17, 1965, 354 F.2d 358, 363–365; Garrott v. United States, supra. Cf. Vitarelli v. Seaton, 359 U.S. 535, 546, 79 S.Ct. 968, 3 L.Ed. 2d 1012 (1959).

tion has nothing to do with the security aspects of the case. That general claim, rooted in a misconception of a Civil Service Commission directive, the court properly rejects.